[Crim. No. 12378. In Bank. July 2, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLEY LUTHER PIKE, Defendant and Appellant.

Roger S. Hanson, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal from the death sentence imposed by the jury on a retrial of the penalty issue.

Conviction of murder in the first degree and robbery was affirmed by this court in 1962 (*People* v. *Pike,* 58 Cal.2d 70 [22 Cal.Rptr. 664, 372 P.2d 656]; cert.den. 371 U.S. 941 [9 L.Ed.2d 277, 84 S.Ct. 324]). In 1967 in habeas corpus proceedings (*In re Pike,* 66 Cal.2d 170 [57 Cal.Rptr. 172, 424 P.2d 724]) the case was remanded for retrial on the penalty phase in the light of our decision in *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], as to prejudicial comments and instructions on possible

future action by the judge, the adult authority or the Governor in modifying sentence. Judgment was affirmed in all other respects.

*Facts*: Pike was in the course of robbing a store on December 8, 1960, when Police Officer Kent entered to purchase a battery. Pike ordered him at gun point to walk around a table and as Kent did so he was shot and mortally wounded by Pike. Pike was apprehended by another officer when he ran out of the store and fired at his captors. At the penalty retrial the People introduced testimony as to prior robbery offenses committed by Pike, and as to his pimping activities. Portions of his testimony from the previous trial were read, in which Pike acknowledged committing a number of prior offenses and acknowledged using a certain gun with which to kill Officer Kent. Evidence was introduced regarding an abortive attempt by Pike and others to escape from death row at San Quentin.

■ *Question*: One. *Was it reversible error to allow challenge for cause to jurors who voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction?*

*No.* Subsequent to the penalty retrial, *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], was decided. The rules stated therein were made to apply retroactively. In *In re Anderson*, 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117], this court granted a new penalty trial on this ground. In *Witherspoon (supra*, 391 U.S. at pp. 521-522 [20 L.Ed.2d at pp. 784-785]) it was stated: "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or exprssed conscientious or religious scruples against its infliction.[21]" Footnote 21 (391 U.S. at p. 522 [20 L.Ed.2d. at p. 785].) expounds further: "Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and

circumstances that might emerge in the course of the proceedings. . . . nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . ." (Italics the court's.)

Looking at the record here it is different from the facts in the *Witherspoon* case. There the *voir dire* commenced by the trial court stating "Let's get these conscientious objectors out of the way, without wasting any time on them," and in rapid succession 47 were successfully challenged for cause on the basis of their attitudes toward the death penalty. Thirty-nine acknowledged having conscientious or religious scruples against the infliction of the death penalty or against its infliction in a proper case, and were excluded without any effort to find out whether their scruples would invariably compel them to vote against capital punishment. Only one who admitted to scruples against the death penalty was examined at any length.

The *voir dire* was conducted without undue haste, jury selection took three days. On the first morning two veniremen were excused for cause in connection with their attitude toward capital punishment, and thereafter some 33 prospective veniremen were examined. The court instructed that their sole duty would be to determine between two penalties, life imprisonment and death (stated in that order); that it was up to their absolute discretion, judgment and conscience which they would select; and he asked each juror if he had any conscientious scruples that would preclude him from voting for the death penalty in what he (the juror) considered to be a proper case. Mr. Adrian and Mrs. Abel each answered "yes." On *voir dire* defense counsel told Mr. Adrian "You realize that we are concerned here with not a lack of pleasure with being saddled with the responsibility but rather with a state of mind that would preclude you from returning the death penalty *in any case*" (italics added). Adrian responded that he understood that. He was then given an example of a middle class person who wanted to get rich quick and hired gunmen to hold up a Brink's truck and kill the guards, no mitigating circumstances being present, and was asked whether his conscientious opinion was such that he

could not return a verdict of death against that person. He answered "Yes." When asked "That is because of your conscientious opinions?" he answered "Yes." Challenge for cause by the People was allowed.

Mrs. Abel was told that the concern was whether she had an absolute or fixed opinion that might indicate a conscientious opinion that *under any circumstances* she could not impose the death penalty, and she answered that she understood that. She was given the example of a person who accepted five million dollars to assassinate the President of the United States, with no mitigating circumstances, and was being prosecuted for such murder, and was then asked if she felt that her conscientious opinion would preclude her from imposing the death penalty in such a case. She answered "it would." Challenge of the People for cause was allowed.

These persons not only indicated that they would not vote for the death penalty in the clearly aggravated situations given to them, but by language which is hardly susceptible of misinterpretation were questioned whether they could "*in any case*" or "*under any circumstances*" vote for the death penalty and answered unequivocally "no." This was more than assenting to a question whether a juror would have scruples "in a proper case." Under footnote 9 of *Witherspoon*, (*supra*, 391 U.S. at pp. 515-516 [20 L.Ed.2d at pp. 781-782]) it is said ". . . it cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see *People* v. *Bandhauer*, 66 Cal.2d 524 [58 Cal.Rptr. 332, 426' P.2d 900]) . . . thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him."

▆▆▆ In the process of selecting a jury, veniremen were excused upon challenge made by defendant. Mrs. Benton, Mrs. Ledebuhr, and Mrs. Ikebata indicated that they could not vote for life if it meant possibility of parole; Mr. Fraser indicated that he could not be fair to anyone who had killed a policeman; Mrs. Brod and Mrs. Biava indicated they could not be fair because they had friends or relatives who had been killed as a result of acts of violence. Challenge for cause was made by defendant when Mr. Crum indicated he might have a tendency to sway toward the police side of it. The court denied this challenge but Mr. Crum was later excused on peremptory. No *Witherspoon* error can be claimed by defendant as to these.

■ *Question: Two. Was it reversible error for the court to use or allow the use of the phrase "in a proper case" in the interrogation of prospective jurors relative to their scruples?*

*No.* As used here it indicates merely that a juror must make the determination himself as to when the extreme penalty should be inflicted. The jurors were instructed that they could consider all of the evidence, the circumstances of the crime, the background of the accused, any matters in mitigation or aggravation, and that they had absolute discretion as their judgment and conscience should dictate. The instruction is in accord with Penal Code section 190.1. ■ The phrase "in a proper case" was critically referred to in *Witherspoon* (*supra*, 391 U.S. at p. 516, fn. 9 [20 L.Ed.2d at p. 782]) but was not proscribed. As stated in *People* v. *Varnum,* 70 Cal.2d 480, 493 [75 Cal.Rptr. 161, 450 P.2d 553], "neither the words 'in a proper case' nor any other words, taken alone, can be seized upon as a touchstone by which to determine the quality of the juror under *Witherspoon.*" ■ Our review of the record in this case satisfies us that the use of the phrase does not fall within the criticism which appears in *Witherspoon.*

■ *Question: Three. Was it reversible error to admit testimony of defendant from the first trial?*

*No.* Prior to the guilt trial defendant made incriminating statements to police officers. These were not introduced at the trial. He testified on his own behalf. In *In re Pike,* (*supra,* 66 Cal.2d at pp. 173-174) we held that the decisions in *Escobedo, Dorado* and *Miranda* do not control his pre-trial statements which were not introduced, and we noted that defendant had not alleged that the taking of these statements impelled him to make his testimonial confession at the trial or otherwise aided the prosecution in mounting his case. Defendant now urges that he did not know until *People* v. *Spencer* (66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715]), filed the same date as *In re Pike,* that this defense was available to him.

There is no merit to defendant's contention that he should be granted a new trial on the guilt phase. In *People* v. *Spencer* (*supra,* 66 Cal.2d 158) the incriminating statements were used at the trial; here they were not. Defendant introduces no evidence that he took the stand at the guilt phase because of matters not received in evidence against him. Essential unfairness must be shown as a demonstrable reality, not as a matter of speculation. (*United States* ex rel. *Darcy* v.

*Handy*, 351 U.S. 454, 462 [100 L.Ed. 1331, 1337, 76 S.Ct. 965].)

█ ▪*Question*: *Four. Was it prejudicial error for the court to deny a mistrial relative to statements in another proceeding?*

*No.* During a hearing on motions to relieve counsel in another case, held in the presence of this jury, the prosecutor stated in the course of colloquy between court and counsel: ''After looking over the evidence and preparing the case it is apparent that this will be tried as first degree murder and as a capital case. . . .'' The court instructed the jury to forget such observation and that it had no bearing on the present matter. It is presumed that the jurors followed the court's instructions. No prejudice is demonstrated or found.

█ *Question*: *Five. Was it prejudicial error for the judge not to disqualify himself because he had presided at another trial which upheld the death penalty?*

*No.* He had presided at the trial of one Robert Emmet Thornton in which the death penalty was upheld; and in that proceeding there was evidence linking Pike with other persons in an attempted escape from death row at San Quentin. No challenge was made at the present trial to the qualifications of the judge on this ground. No showing of bias or prejudice is demonstrated from the judge's prior knowledge nor his upholding the death penalty in another case. The death penalty has long been upheld in California.

█ *Question*: *Six. (a) Is the death penalty unconstitutional because of the lack of guidelines to enable the jury to arrive at their decisions?*

*Six. (b) Is the death penalty unconstitutional because it constitutes cruel and unusual punishment?*

*No.* Our decision in *In re Anderson* and *Saterfield*, 69 Cal.2d 613, [73 Cal.Rptr. 21, 447 P.2d 117], fully answers these contentions.

█ *Question*: *Seven. Was it prejudicial error to admit evidence of other offenses?*

*No.* At the penalty trial evidence was received of other criminal activity on the part of defendant for which he was never tried. The court instructed the jury that evidence of other crimes could not be considered as evidence in aggravation unless they were proved beyond a reasonable doubt. Relevant evidence may include matter indicative of a recurrent behavior, and it was introduced for this purpose at the penalty trial. (*People* v. *Tahl*, 65 Cal.2d 719, 734 [56 Cal.

Rptr. 318, 423 P.2d 246].) The offenses were not introduced as priors here.

Defendant urges that evidentiary use of prior crimes where the defendant was not represented by counsel may not be used, citing *Burgett* v. *Texas,* 389 U.S. 109 [19 L.Ed.2d 319, 88 S.Ct. 258]. In *Burgett* the court was considering a Texas trial wherein the prosecution sought to introduce records of a prior Tennessee conviction which showed on their face that the defendant had not been represented by counsel in Tennessee and that conviction was void; and it was held that instructions to disregard this were not likely to make the constitutional error "harmless beyond a reasonable doubt" as right to counsel was guaranteed by the principles stated in *Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733].

 *Question: Eight. Was it prejudicial error to require defense counsel to supply names and addresses and expected testimony of defense witnesses?*

*No.* This information would necessarily be disclosed at the trial and the witnesses would be subject to cross-examination. *Jones* v. *Superior Court,* 58 Cal.2d 56 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213], permits the People to obtain discovery in advance of trial. Discovery enables the prosecution to perform its trial function more effectively. Disclosing this information does not interfere with the defendant's right of privacy, freedom from self-incrimination, or the lawyer-client relationship. Absent the privileges afforded by law, the defendant has no valid interest in denying the prosecution access to evidence that can throw light on the issues.

 *Question: Nine. Was it prejudicial error to admit photographs of the victim's body?*

*No.* These were black and white photographs, there was nothing objectionable in introducing them. They had some relevant value, and were used by the prosecution in asking a hypothetical question of a doctor regarding the deceased's injuries and his ability to fire in the direction of the person committing the attempted robbery. There was none of the gruesomeness present in the pictures found to have been erroneously admitted in *People* v. *Redston,* 139 Cal.App.2d 485, 490 [293 P.2d 880]. It was within the court's discretion to determine whether their probative value outweighed any prejudicial effect. (See *People* v. *Talbot,* 64 Cal.2d 691, 706 [51 Cal.Rptr. 417, 414 P.2d 633]; *People* v. *Kendrick,* 56 Cal.2d 71, 91 [14 Cal.Rptr. 13, 363 P.2d 13].)

*Question*: Ten. *(a)* *Was it reversible error to permit the People to call Dr. Pollack as a rebuttal witness?*

Ten. *(b) Was it reversible .error to overrule defense objection to rebuttal evidence offered in the form of an answer to a hypothetical question?*

*No.* The People did not put in any psychiatric evidence in presenting their case in chief. Nor did the defendant. The defense called witnesses who testified as to good qualities in his character. One of these, a former San Quentin chaplain, Father Mullin, testified that he had seen defendant frequently at San Quentin, and that in his opinion defendant had become more aware of the rights, feelings and privileges of his fellow citizens, he thought that a genuine change had taken place for the better. Dr. Pollack did not examine the defendant nor the prison records. He was asked to define a sociopathic personality and to answer a hypothetical question as to whether a person who behaved in. the manner there described could be called sociopathic.

Dr. Pollack testified extensively as to the meaning of a sociopathic personality: basically this is a term used to describe how an individual has acted over many years, the kind of life he has lived and the way he perhaps chooses to live, the way he feels about people, the kind of things he does,—a behavior description. Such persons do not seem to learn or tend to change a great deal. This was offered to rebut the defense evidence that there had been a change in the defendant's behavior.

The hypothetical question put to Dr. Pollack consisted of a recitation of criminal acts committed by a person. since he was 18 as to whether they indicated a sociopathic personality—the acts obviously referring to former incidents in the life of the defendant. Dr. Pollack answered that they did, on the basis of this question. He made it more than clear that he was answering only in a generalized way, that given other factors, such as the ameliorating ones stated in a hypothetical question put to him by the defense, this might affect his answer. He was thoroughly cross-examined as to his reasons. He stated he could not tell if a change. had taken place in this defendant without an opportunity for personal examination and observation; that he would take the opinions, feelings, responses of anyone, including Father Mullin, who had a good deal of contact with this hypothetical person, that it wasn't impossible for a sociopathic personality to change, but it was less likely.

Defendant cites *People* v. *Bassett*, 69 Cal.2d 122 [70 Cal. Rptr. 193, 443 P.2d 777] in support of his contention that the admission of this testimony was prejudicial. The cases are distinguishable. There the defense put in extensive psychiatric evidence of mental inability to form the intent required by law for the crime charged. The prosecution sought to rebut this by introducing two psychiatric witnesses who had not examined him but who had read the prison records and who gave their opinion as to his mental capacity to form the requisite intent. This was held to be admissible but insubstantial evidence to support an implied finding of mental capacity on the issue of guilt. The evidence here was offered to rebut evidence as to rehabilitation. It was relevant on the overall issue of background and history, and change.

In *People* v. *Morse*, 60 Cal.2d 631, 647 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], we said, "The jury decides whether the individual should be permitted to live upon the basis of a complete and careful analysis of that person as a human composite of emotional, psychological and genetic factors. The jury looks at the individual as a whole being and determines if he is fit to live. The jury is entitled to weigh psychiatric and other testimony as to his susceptibility to rehabilitation and reformation. . . ."

 *Question*: *Eleven. Were the prosecution's remarks to the jury prejudicial?*

*No.* At the close of the trial the prosecution addressed the jury urging that this was a proper case for the death penalty stating, "He went in there with a loaded gun and he wasn't bluffing. . . . The evidence is there without any question and I think this illustrated a cold-blooded killing and under other circumstances, with all of his background, with his antisocial behavior, and pointing to the fact that he is a sociopath, it would still be a proper case." He went on to point out defendant's actions, reiterating from Dr. Pollack's testimony that this indicated a psychopathic personality and such persons seldom change; and that even if he was now remorseful, and no longer sociopathic, even if he would make a good prisoner, he doesn't deserve a life sentence, he has earned the death penalty for what he has done.

Defendant urges that the argument of the People indicated that by his appearing with a loaded gun at the robbery scene he deserved the death penalty as this indicated callousness, wanton disregard and sociopathy and he contends that no evidence was introduced to indicate that robbery perpetrators

appearing with guns are more sociopathic and deserve death more than those who do not. He cites *People* v. *Love,* 56 Cal.2d 720, 729 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], in which this court condemned a closing argument which stated "It is a known fact that callous, hardened criminals when they commit burglaries . . . rarely carry loads in their pistols . . . they unload their guns and as insurance against not getting the death penalty. . . ." and stated (p. 730) "Counsel's summation to the jury 'must be based solely upon those matters of fact of which evidence has already been. introduced or of which no evidence need be introduced because of their notoriety as judicially noticed facts.' . . . He (prosecutor) may not use evidence offered for a special purpose . . . to argue inferences for which the evidence is inadmissible."

 It is appropriate for the prosecution to ask for the death penalty based upon the evidence produced as to defendant's crime and past history. The prosecutor has a wide range to express his views of what the evidence shows and the conclusions that should be drawn. (*People* v. *Burwell,* 44 Cal.2d 16, 40 [279 P.2d 744].) It is not improper to argue that going into a store for the purpose of committing a robbery and carrying and using a loaded gun can indicate a cold-blooded killing, particularly in view of other times this defendant had shot at people.

The prosecution sought to reinforce its argument by stressing the rebuttal evidence of Dr. Pollack, and arguing from it that defendant was sociopathic. Dr. Pollack's evidence was not that this defendant was sociopathic, but merely that one who had exhibited some of his kind of behavior showed a behavior pattern of a sociopath, and admittedly Dr. Pollack's opinion was not based upon all the facts in defendant's history nor from any personal knowledge. In itself it was not of great probative value. As used by the prosecution in his closing argument it could be concluded that he gave it more weight than it would have normally carried.

 *Question: Twelve. Was it prejudicial to allow prior testimony to be read into evidence?*

*No.* Two police officers who testified at the preliminary hearing were not present at the first trial nor at this one. Defense counsel stipulated at each trial that this prior testimony could be read to the jury. Defendant now contends that this deprived him of his right to confrontation of witnesses, citing *Barber* v. *Page,* 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct.

1318], and *Berger* v. *California,* 393 U.S. 314 [21 L.Ed.2d 508, 89 S.Ct. 540]. *Barber,* made "fully retroactive" in *Berger,* requires that the state make a good faith effort to secure the witness' presence before introducing at a trial the transcript of evidence given by a witness at a prior hearing when the witness is not available or is not produced at the present hearing. In *Barber* the evidence was introduced over defendant's objections.

Prior to *Barber* defendant could have sought to bar this testimony on the ground that the absent witnesses were not unavailable (Evid. Code, §§ 1200, 1291, 240) and might have asked for a continuance until the sick witnesses were able to testify (Pen. Code, § 1050). It does not appear that *Barber* accorded to defendant in this case any greater rights than he had under the applicable California statute. Accordingly defendant, in failing to object at trial to the prosecution's use of the prior testimony, waived both his statutory rights and the rights conferred thereafter by *Barber.* (See *People* v. *McGautha* (1969) 70 Cal.2d 770, 780 [76 Cal.Rptr. 434, 452 P.2d 650].)

None of the contentions urged by defendant, nor all of them together, bring this within the purview of section 13 of article VI of the state Constitution.

The judgment is affirmed.

Traynor, C. J., Tobriner, J., Burke, J., Sullivan, J., and Roth, J. pro tem.,* concurred.

PETERS, J.—I dissent.

The majority opinion states one of the questions involved in this case as follows: "*Was it prejudicial error to require defense counsel to supply names and addresses and expected testimony of defense witnesses?*" The answer given by the majority was "*No,*" and the reasons advanced to support such a startling doctrine were "This information would necessarily be disclosed at the trial and the witnesses would be subject to cross-examination. *Jones* v. *Superior Court,* 58 Cal.2d 56 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213], permits the People to obtain discovery in advance of trial. Discovery enables the prosecution to perform its trial function more effectively. Disclosing this information does not interfere with the defendant's right of privacy, freedom from self-incrimination, or the lawyer-client relationship. Absent the

---

*Assigned by the Chairman of the Judicial Council.

privileges afforded by law, the defendant has no valid interest in denying the prosecution access to evidence that can throw light on the issues.''

This statement of the prosecution's right to pretrial discovery is far too broad, is not supported by *Jones,* and demonstrates a callous disregard of a defendant's constitutional, statutory, and common law rights. This claimed interpretation of *Jones* justifies the fears expressed by Justice Dooling in his dissent in the *Jones* case. He there stated at page 68 : ''Historically and by constitutional safeguards the right of defendants in criminal cases to be free of any procedure savoring of judicial inquisition has been jealously protected. As Justice Peters points out in his dissenting opinion, at least absent some legislative provision such as those with regard to the defense of alibi referred to in the majority opinion, a defendant in a criminal case has never been compelled, in advance of the production of the prosecution's evidence against him, to determine upon what if any defenses he may ultimately rely. The opinion of the majority in this case makes a breach, even if a comparatively small one, in this right of this defendant and compels him now to commit himself to refrain from interposing the affirmative defense of impotency unless he makes certain disclosures to the prosecution in advance of the trial. I am fearful, not so much of the step taken in this case, as of its possible implications. It is purely by virtue of the accidental fact that the defendant in this case asked for a continuance to procure evidence to support a claim of impotency that the prosecution was aware of the possibility that such a defense might be interposed. Normally the nature of his defenses would not be disclosed by the defendant in advance of trial. Are we laying down a rule in this case limited to similar cases, i.e., to cases in which for some reason the defendant in advance of trial chances to disclose in some manner his intention to rely upon some affirmative defense ? If so the cases will be rare indeed in which the prosecution will be entitled to discovery. Or are we opening the door, as Justice Peters suggests, to a general inquiry by the prosecution whether the defendant intends to rely on any affirmative defense and if so what the nature of such affirmative defense may be ? If the latter, and this seems the logical conclusion from the majority's holding, by court-made rule we are depriving the defendant of the right which he heretofore always enjoyed of waiting until the close of the prosecution's case to determine the defense or defenses, if any, which he might then interpose.

"If the defendant's traditional freedom of action is thus to be curtailed, that curtailment seems to me to be preeminently a legislative and not a judicial function. The majority opinion cites no case from any jurisdiction in which any court has undertaken without statutory sanction to curtail this traditional right of a defendant, and I consider it unwise and dangerous for this court to enter upon such delicate ground.

"I have some doubt of the constitutional limitations on our judicial power to subject a defendant in a criminal case to any form of discovery. Justice Peters has elaborated the basis of that doubt. But putting constitutional questions aside I am fearful as a matter of policy of the future outcome of even so small an initial court-created inroad upon the heretofore unquestioned right of a defendant in a criminal case to remain silent, if he chooses, at every stage of the proceeding against him."

*Jones* does not stand for the broad rule stated in the majority opinion. Even in its broadest application *Jones* holds that where, before trial, the defendant voluntarily discloses that he intends to rely on an affirmative defense, he may be compelled to divulge his witnesses. The cases relied upon in the majority opinion in *Jones* were all cases where by statute it was provided that if the defendant relies on the defense of alibi he must disclose the names of his alibi witnesses. *Jones* does not hold that a defendant in a criminal case can be compelled, generally, to disclose the "names and addresses and expected testimony of defense witnesses." The majority seem to believe this should be done because it will permit the prosecution "to perform its trial function more effectively." So would the processes of the inquisition, the rack and the screw and all other forms of coerced confessions. These would make the prosecutor's job an easier one, and more effective, but until today it has never been implied, far less held, that constitutional and statutory rights may be forgotten or disregarded simply because so to do renders the prosecution more effective.

*Jones* does not hold, as the majority imply, that because pretrial discovery is allowed a defendant that in fairness it also must be allowed to the prosecution. *Jones* did not and constitutionally could not make discovery a two-way street. Constitutionally and by statute limits are placed on pretrial discovery by the prosecution so that discovery is in fact a one-way street. The state is required to prove a defendant guilty beyond a reasonable doubt before a defendant can be forced to

disclose his defense. The very silence of the defendant cannot even be commented on (*Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]). Constitutionally the prosecution cannot prove a defendant's guilt out of his own mouth, unless he consents. This is a constitutional right that is fundamental, unlimited and absolute. It is so fundamental that a defendant cannot be compelled in any significant way to give evidence against himself until the prosecution has established a prima facie case that citation for such an obvious principle is unnecessary. Compelling a defendant to give the names and addresses of his proposed witnesses and to disclose their testimony in advance of trial does just that.[1]

Although *Jones* may have involved only a minor impairment of constitutional rights, what I there said in my dissent in that case is doubly applicable here. It is there stated: "It is the constitutional right of the defendant, who is presumed to be innocent, to stand silent while the state attempts to meet its burden of proof, that is, to prove the defendant's guilt beyond a reasonable doubt. The defendant, up until now, did not have to take an active part in the ascertainment of the facts. The majority opinion does not merely enlarge a simple judicial principle of pretrial procedure, it fundamentally alters our concepts of the rights of the accused, and forces him to come forward with information before the prosecution has presented a case against him. . . . While, of course, a criminal trial should be 'fair' to the prosecution as well as to the defense, it should not be forgotten that the defendant has additional constitutional and statutory rights not given to the prosecution. The right not to incriminate himself, the right to remain absolutely mute until a prima facie case has been established, the right to the presumption of innocence until proved guilty beyond a reasonable doubt, are a few of these rights that completely refute the 'one-way street' argument." (58 Cal.2d at pp. 64-65.)

As also pointed out in my dissent in the *Jones* case the contention that a defendant can be forced to disclose his defense testimony prior to trial is patently fallacious. It is there stated at page 66: "This type of 'reasoning' overlooks the possibility that the compelled revelation by the defendant that he may have only a weak defense may itself be self-incriminating. Until today, in California, a defendant could

---

[1]The solicitude of the United States Supreme Court for the Fifth Amendment is shown not only by the *Griffin* case, but by such cases as *Marchetti* v. *United States*, 390 U.S. 39 [19 L.Ed.2d 889, 88 S.Ct. 697]; *Grosso* v. *United States*, 390 U.S. 62 [19 L.Ed.2d 906, 88 S.Ct. 709];

weigh his proposed defense against the prosecution's case, and not make up his mind until he heard the strength or weakness of the case against him whether he would rely on a straight not guilty defense or urge an 'affirmative' defense. Now he must make that decision before the state's presentation. If the majority opinion were sound, it would mean logically that the prosecution could serve interrogatories upon a defendant demanding to know whether or not he intends to rely on an 'affirmative' defense, what it is, and what evidence he has to support it. I am not willing to see fundamental constitutional rights emasculated in this fashion.''

For these reasons I am of the opinion that it was constitutional and prejudicial error to compel defendant prior to trial to disclose the names and addresses and the testimony of his witnesses.

I think the judgment should be reversed.

*Haynes* v. *United States,* 390 U.S. 85 [19 L.Ed.2d 923, 88 S.Ct. 722]; *Leary* v. *United States* (decided May 19, 1969) 395 U.S. 6 [23 L.Ed.2d 57, 89 S.Ct. 1532], and *United States* v. *Covington* (decided May 19, 1969) 395 U.S. 57 [23 L.Ed.2d 94, 89 S.Ct. 1559], all decided since the *Jones* case.