STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. ULYSSES G. MONTAGUE, DEFENDANT-RESPONDENT.

Argued November 17, 1969—Decided March 2, 1970.

---

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause for the appellant (*Mr. Joseph P. Lordi,* County Prosecutor of Essex County, attorney).

*Mr. Arthur Penn,* Assistant Deputy Public Defender, argued the cause for the respondent (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

The opinion of the court was delivered by

JACOBS, J. The defendant was convicted for assault and battery on a police officer (*N. J. S.* 2A:90–4) and for threatening the life of the police officer by pointing a revolver at him (*N. J. S.* 2A:113–8). The Appellate Division reversed his convictions (101 *N. J. Super.* 483 (1968)) and we certified on the State's application. 53 *N. J.* 353 (1969).

While on duty and in uniform, Police Officer Nance observed a Ford Mustang traveling south on Johnson Avenue in Newark without a valid motor vehicle inspection sticker. After he had stopped the car, its driver Clarence Lollie displayed a driver's license and a registration certificate neither of which was in his name. The other occupants of the car

were the defendant Ulysses G. Montague, his seventeen year old niece Lilliteen Rochelle, and his nephew Cornell Rochelle. Lollie left the car to talk to Nance and while the others remained in the car Cornell began blowing its horn to attract his friend Charles Jones who was passing by. Nance, after telling Cornell that his blowing of the horn was a violation of the law and to stop it, continued his conversation with Lollie. Lilliteen then began blowing the horn in more persistent fashion. Nance told her to stop but she became highly abusive, refused to be calmed, and finally was placed under arrest. When she started to walk away despite Nance's instruction that she stand there, Nance reached for her and she started swinging. Nance tried to handcuff her but Lollie grabbed his arm pulling him back. Nance struck Lollie and was tussling with him when the defendant, who up to that point had remained in the car, joined in.

According to Nance's testimony, Lollie still had hold of him and Lilliteen was still kicking and cursing him when the defendant shouted "hold his arm while I get his gun." The defendant pulled Nance's gun from its holster, pointed it at Nance, told him to "get back" and when Nance told him to give him the gun he again told him to get back and said he would shoot him. At that point Nance lunged for the gun and the defendant struck him with it on the side of his head. Nance ran to his nearby motorcycle radio, summoned aid, and other officers soon arrived. They went after Lollie who was fleeing and apprehended him. Nance with the aid of the officers subdued the defendant.

Mr. James L. Barrett, Jr., assistant to the principal at South Side High School, and Alvin Picker, a teacher at the same institution, observed the event and substantially corroborated Nance. Barrett saw the defendant with the gun in his hand and saw him strike Nance. Picker saw the defendant hit Nance "with what you would call like a tackle." Officers Charles A. Kneipher and Richard Klemm, who were among those who responded to Nance's call for

aid, testified that they saw the defendant pointing the gun in Nance's direction and that they assisted in arresting Lollie and subduing the defendant.

The defendant testified that he heard Nance tell his niece to stop blowing the horn but denied that he knew that Nance had arrested his niece or that she was resisting arrest. He testified that he saw his niece leave the car and heard her tell Nance that he was "a nigger cop in uniform"; Lilliteen and the other occupants of the car, as well as Officer Nance, were Negroes. The defendant's testimony continued as follows: "That is all I could hear but he said don't call me no nigger cop or I'll smack you. My niece said I'll smack you back." The defendant testified further that he saw Nance beating his niece, that when Lollie tried to intervene he was "knocked away", and that when he, the defendant, tried to intervene Nance reached for his gun. The defendant admitted that he took the officer's gun and stated that he refused to return it because he was afraid he "was going to be shot." He also admitted that after the officer had lunged at him he struck him in the head but denied that he had pointed the gun at the officer or had threatened to shoot him.

In addition to the defendant Montague, Lollie, Lilliteen, Cornell and Charles Jones testified for the defense. Lilliteen testified that she blew the horn to attract Jones, that Nance told her not to blow the horn, that Nance called her "a wise bitch" and said he would lock her up, and that she told Charles Jones that "that's what's wrong with the nigger cops today. The ones doing something they don't see and the ones not doing anything they see." At that point, according to Lilliteen, Nance told her he would slap her if she called him a "nigger" again and that she replied "I'll slap you back." Continuing her testimony, Lilliteen stated that Nance then punched her in the eye with his left fist and that thereafter Lollie and the defendant intervened. Both Cornell Rochelle and Clarence Lollie testified along the same lines.

Charles Jones testified on direct examination that he heard Nance tell Lilliteen not to blow the horn, that he heard the officer call her a "wise little bitch" and that he heard her reference to "nigger" officers. He testified that Lilliteen told Nance "You don't have to put handcuffs on me, because I'm not going anywhere" and that he saw Nance hit Lilliteen. On cross-examination he testified that he saw Nance attempt to put handcuffs on Lilliteen and saw her resist by kicking and fighting. He further testified that he had theretofore given a statement to Mr. Colton, counsel for the defendant Montague. At that point the prosecutor called for the production of the statement. Mr. Colton objected but the court overruled him and thereupon he produced the statement which was then shown to the witness. The statement was in Mr. Colton's handwriting and was unsigned. After the witness read it he answered affirmatively to specific inquiries as to whether it was his statement and whether he had talked it over with several friends. In the statement, the witness was quoted as having said that Nance had remarked you are one of those "wise girls" rather than a "wise bitch" which was his earlier testimony on direct examination. The witness was also quoted in the statement as having reported that Lilliteen had said to him "those nigger cops are always starting trouble" whereas on the stand the witness denied hearing Lilliteen make such statement.

After the jury had returned its verdict of guilt against the defendant Montague and he had been sentenced to State Prison, he appealed to the Appellate Division. There the court reversed on the ground that the trial judge had committed prejudicial error in requiring defense counsel to produce a copy of Charles Jones' unsigned statement in counsel's handwriting and in permitting the prosecution to use the statement in cross-examining Jones. The Appellate Division described the statement as defense counsel's notes of his interview with Jones, found no specific court rule authorizing the trial judge's ruling that they be pro-

duced for purposes of the prosecutor's cross-examination, held that while *State v. Hunt*, 25 *N. J.* 514 (1954) permitted discovery of the notes of the prosecution's witnesses it was inapplicable to the notes of the defense witnesses taken by defense counsel, and concluded that they constituted work product within the principle against discovery enunciated in *Hickman v. Taylor*, 329 *U. S.* 495, 67 *S. Ct.* 385, 91 *L. Ed.* 451 (1947). *See* 101 *N. J. Super.* at 487–88. The Appellate Division recognized that *Hickman* was a civil case but felt that its underlying motivations were "equally applicable to the setting of a criminal case." 101 *N. J. Super.* at 488.

In *Dennis v. United States*, 384 *U. S.* 855, 86 *S. Ct.* 1840, 16 *L. Ed. 2d* 973 (1966), the Supreme Court recently referred to "the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice," and it also referred to the "expanding body of materials, judicial and otherwise, favoring disclosure in criminal cases analogous to the civil practice." 384 *U. S.* at 870–71, 86 *S. Ct.* at 1849, 16 *L. Ed. 2d* at 984. In *State v. Cook*, 43 *N. J.* 560 (1965), we had occasion to review our own discovery practices in the criminal field, particularly as they related to pretrial applications, and there have been additional developments of significance since that case was handed down. *See State v. Tate*, 47 *N. J.* 352 (1966) ; *Report of New Jersey Supreme Court's Special Committee on Discovery in Criminal Cases*, 90 *N. J. L. J.* 209 (1967) ; *R. R.* 3 :5–11 ; *R.* 3 :13–3.

In *Cook* we sustained the defendant's contention that there should be mutual pretrial disclosure of reports of psychiatric examinations of the defendant. In the course of our opinion we noted that since the creation of our new judicial structure, and its implementation with rules embodying modern discovery principles, we had consistently applied our civil practice rules "liberally and with awareness that the interests of truth and justice are best served by broad mutual discovery before trial." 43 *N. J.* at 563. In criminal proceedings,

equally broad mutual discovery was generally unobtainable because of the defendant's constitutional privilege against self-incrimination, and influenced largely by this, criminal discovery took a somewhat different course. In the early stages this Court severely restricted the defendant's right to pretrial discovery from the prosecutor; illustrative was the four to three decision in *State v. Tune,* 13 *N. J.* 203 (1953) where the defendant was denied permission to examine even his own confession before trial. Later decisions and rule changes have flatly rejected the philosophy of the majority opinion in *Tune* and its holding is no longer law. *See State v. Cook, supra,* 43 *N. J.* at 564–66; *State v. Johnson,* 28 *N. J.* 133, 136 (1958).

*State v. Tate, supra,* while rejecting the defendant's application for an order permitting him to take pretrial depositions of prospective State witnesses, noted the substantial strides which had been taken here and elsewhere in criminal pretrial discovery and called for further exploration of the subject at a forthcoming Judicial Seminar. 47 *N. J.* at 357. That was done and thereafter our court rules relating to discovery in criminal cases were amended effective October 5, 1967 (*R. R.* 3:5–11). As thus amended they were embodied in the recent general revision, effective September 8, 1969. See *R.* 3:13–3. In pertinent part they now provide that upon defendant's motion, and absent a showing of good cause to the contrary, the trial court shall order the prosecuting attorney to permit the defendant to inspect "any relevant records of statements, signed or unsigned" by persons known by the prosecuting attorney to have relevant evidence or information. *R.* 3:13–3(c) (2). They further provide in *R.* 3:13–3(d) that, if the court grants such discovery to the defendant, it may condition its order by requiring the defendant to disclose to the prosecuting attorney the names of persons the defendant intends to use as witnesses at trial "and their written statements, if any." *R.* 3:13–3(e) states that, except as hereinbefore specifically provided, the rule does not authorize discovery by a party of "reports, memo-

randa or internal documents" made by any other party, his attorney or agents in connection with the investigation, prosecution or defense of the matter, nor does the rule permit discovery by the State of "records of statements, signed or unsigned" by the defendant himself to his attorney or agents.

R. 3:13-3 does not specifically define the word "statement" therein or any of its other pertinent terms. *Cf.* 18 *U. S. C. A.* § 3500(e); *American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial* 62 (Tent. Draft May 1969). Its terms will naturally have to be read in context and fairly construed in the light of the overriding general objective, namely the substantial broadening of pretrial discovery in criminal cases with mutuality within constitutional limits. *See* 8 *Moore, Federal Practice* § 16.08[2], at 16–84 (*2d ed.* 1969); *cf.* Smith & McCollom, "Counterdiscovery in Criminal Cases: Fifth Amendment Privilege Abridged," 54 *A. B. A. J.* 256 (1968). *See also Jones v. Superior Court,* 58 *Cal. 2d* 56, 22 *Cal. Rptr.* 879, 372 *P. 2d* 919, 96 *A. L. R. 2d* 1213 (1962); *People v. Lopez,* 60 *Cal. 2d* 223, 32 *Cal. Rptr.* 424, 384 *P. 2d* 16 (1963); *People v. Pike, Cal.,* 78 *Cal. Rptr.* 672, 455 *P. 2d* 776 (1969); *State v. Grove,* 65 *Wash. 2d* 525, 398 *P. 2d* 170 (1965); Traynor, "Ground Lost and Found in Criminal Discovery," 39 *N. Y. U. L. Rev.* 228, 243–50 (1964); Louisell, "Criminal Discovery: Dilemma Real or Apparent?", 49 *Cal. L. Rev.* 56, 87–90 (1961); "California Creates Pretrial Discovery for the Prosecutor," 15 *Stan. L. Rev.* 700 (1963).

In *Jones, supra,* the defendant was charged with rape and obtained a continuance to enable him to gather evidence in support of his claim of impotency; on the prosecutor's application, the California Supreme Court directed that the defendant furnish copies of pertinent reports and x-rays he intended to introduce at the trial, along with the names and addresses of pertinent witnesses he intended to call. In the course of his opinion for the court, Justice Traynor noted

that discovery was designed "to ascertain the truth" and that neither the prosecution nor the defense (subject of course to the privilege of self-incrimination) had any valid interest in denying "access to evidence that can throw light on issues in the case." 22 *Cal. Rptr.* at 880, 372 *P. 2d* at 920. In response to the contention that the discovery order violated the privilege, Justice Traynor noted that all it did was to compel the defendant to disclose information that he would "shortly reveal anyway" at trial. 22 *Cal. Rptr.* 879, 372 *P. 2d* at 922. He found persuasive support for advancing the time of the defendant's disclosure in the customary requirements for pretrial disclosure of alibi and insanity defenses; these have thus far widely withstood constitutional attack. 22 *Cal. Rptr.* 879, 372 *P. 2d* at 922; 76 *Harv. L. Rev.* 838 (1963); Comment, "The Self-Incrimination Privilege: Barrier to Criminal Discovery?", 51 *Cal. L. Rev.* 135, 140 (1963); *see State v. Angeleri,* 51 *N. J.* 382, *cert. denied,* 393 *U. S.* 951, 89 S. Ct. 372, 21 *L. Ed. 2d* 362 (1968) where this Court recently rejected a constitutional attack on *R. R.* 3:5–9 (now *R.* 3:11–1) which provides that if a defendant intends to rely on an alibi he must furnish a bill of particulars of that claim and the names and addresses of witnesses "upon whom he intends to rely to establish such alibi." *See also R.* 3:12; *State v. Whitlow,* 45 *N. J.* 3, 11 (1965); *cf. United States v. Fratello,* 44 *F. R. D.* 444, 450 (*S. D. N. Y.* 1968).

In *Lopez, supra,* the California Supreme Court applied its holding in *Jones* to support an order directing the pretrial disclosure of the names and addresses of the persons the defendant intended to call in support of his alibi defense along with "[the] written statements or notes of statements by such witnesses." 32 *Cal. Rptr.* at 436, 384 *P. 2d* at 28. In *Pike, supra,* the same court applied *Jones* to sustain a very broad pretrial discovery order of testimony that was going to be introduced at the trial. 78 *Cal. Rptr.* 672, 455 *P. 2d* at 781; *but cf. Ruiz v. Superior Ct.,* 80 *Cal. Rptr.* 523 (*Cal. Ct. App.* 1969). And in *Grove, supra,* the Supreme

Court of the State of Washington, placing its reliance on *Jones,* held that an order requiring a former defense attorney to produce a letter in his possession, written by the defendant to his wife, violated neither the privilege against self-incrimination nor the attorney-client privilege. 398 *P. 2d* at 172–73.

*Jones* has come under attack as an infringement on the defendant's right "to remain silent both prior to and during the trial." Smith & McCollom, *supra,* 54 *A. B. A. J.* at 259. For present purposes we need not embrace the breadth of the holdings in the cited cases which have followed *Jones* for the question before us is a narrower one. Here there was no issue of pretrial discovery nor was there in any sense an infringement on the defendant's right to remain silent. He had voluntarily presented the witness to testify on his behalf and the witness had done so. During the normal cross-examination, the prosecutor called for the prior statement in order to ascertain whether it varied from the direct testimony. If it did, its availability would obviously be of aid in the search for truth. Earlier in the trial the defense had called for and received copies of statements which the State's witnesses had given to the prosecutor and they were duly furnished to defense counsel in compliance with *State v. Hunt, supra,* 25 *N. J.* 514; *R. R.* 3:7–3A; *R.* 3:17–1.

In *Hunt* we held that defense counsel was entitled at trial to examine the prior notes of a prosecution witness and to use them in connection with his cross-examination. Our holding was grounded not on any specific statute or rule but on the court's inherent powers to order discovery when justice so requires. 25 *N. J.* at 524; *State v. Cook, supra,* 43 *N. J.* at 563; *State v. Moffa,* 36 *N. J.* 219, 222 (1961); *State v. Murphy,* 36 *N. J.* 172, 180 (1961); *State v. Winne,* 27 *N. J. Super.* 304, 310 (App. Div.), *certif. denied,* 13 *N. J.* 527 (1953). We noted that cross-examination was the most valuable safeguard that had been discovered in the judicial search for truth and that, if cross-

examination is to be effective, it must have wide latitude in the testing of the recollection of the witness. 25 *N. J.* at 524. While this was said in connection with the testimony of a prosecution witness it applies equally to the testimony of a defense witness. So long as no constitutional privilege is infringed, there is no sensible reason for imposing any restrictions on the cross-examination of defense witnesses beyond those applied to prosecution witnesses. We find no infringement whatever here for, as was said in *Angeleri,* nothing in the Constitution assures to a defendant "a right so to defend as to deny the State a chance to check the truth of his position." 51 *N. J.* at 385. *See People v. Damon,* 24 *N. Y.* 2d 256, 299 *N. Y. S.* 2d 830, 247 *N. E.* 2d 651 (1969); *People v. Sanders,* 110 *Ill. App.* 2d 85, 249 *N. E.* 2d 124 (1969).

In *Damon* the court directed that the defense furnish to the prosecution the prior statements of certain witnesses who were called to testify on behalf of the defendant. On appeal it was urged that this was error but the New York Court of Appeals found to the contrary, saying:

These statements were not those of the defendant but of witnesses offered by the defendant. In no sense can it be said that he is being compelled to produce incriminating statements of his own.

The privilege against self incrimination applies only to evidence of a testimonial or communicative nature obtained from the defendant himself (Schmerber v. California, 384 U. S. 757, 761, 86 S. Ct. 1826, 16 L. Ed. 2d 908; see, also, Jones v. Superior Ct. of Nevada County, 58 Cal. 2d 56, 22 Cal. Rptr. 879, 372 P. 2d 919, 96 A. L. R. 2d 1213; Traynor, Ground Lost and Found in Criminal Discovery, 39 N. Y. U. L. Rev. 228, 246 n; Note, 76 Harv. L. Rev. 838). We have recognized the defendant's right to obtain and inspect statements of prosecution witnesses for possible use in cross-examining them (see People v. Rosario, 9 N. Y. 2d 286, 213 N. Y. S. 2d 448, 173 N. E. 2d 881, 7 A. L. R. 3d 174). There is neither reason nor justification for not allowing the People to procure from the defendant statements taken from his witnesses for the same purpose of cross-examining them.

299 *N. Y. S.* 2d at 834–35, 247 *N. E.* 2d at 654.

In *Sanders* defense counsel was ordered during the state's cross-examination to turn over to the state a prior state-

ment of a defense witness. On appeal it was argued that the statement was privileged and constituted work product. As in the case before us, the statement was given to defense counsel in his office and, after the witness had testified on cross-examination that he had made the statement, there was an order to produce it. The court, citing *People v. Speck*, 41 *Ill.* 2d 177, 242 *N. E.* 2d 208 (1968), said that there was no attorney-client relationship between the witness and defense counsel and the statement was "clearly not privileged," and citing *Monier v. Chamberlain*, 35 *Ill.* 2d 351, 221 *N. E.* 2d 410, 18 *A. L. R.* 3d 471 (1966), said that it was "equally clear that the statement was not part of the attorney's work product." 249 *N. E.* 2d at 126. Stressing that "truth is the objective sought by the courts" it concluded that, absent the barrier of any privilege, there was no reason why "both the State and the defendant should not have an equal right to prior statements for impeachment purposes." 249 *N. E.* 2d at 126.

The defendant's brief does not suggest that the trial court's order for production of the prior statement of the witness Charles Jones was violative of the privilege against self-incrimination or the attorney-client privilege. Instead it seeks to rest on our court rules which, it contends, "specifically prohibit the State from discovery of a defense counsel's notes of an interview with a prospective defense witness." But the fact is that our court rules contain no such prohibition and indeed contain nothing specific with respect to the right of the State to call for the production of a prior statement of a defense witness who has actually testified on direct examination. After *Hunt* (25 *N. J.* 514) recognized the right of defense counsel to examine the prior notes of a prosecution witness the court rules were amended to formalize its holding. *R. R.* 3:7–3A; *R.* 3:17–1. But admittedly *Hunt* itself was not an exercise of a specific rule power but was an exercise of the court's inherent power to order discovery when justice so requires. So here we recognize the right of the prosecutor to inspect the prior

statement of a witness who has testified for the defense and the court rules may hereafter be amended to formalize our holding. This step will be fully compatible with the trend of our pretrial discovery rules which, as we have already indicated, are significantly geared towards broader mutual discovery within constitutional limits.

The defendant's brief urges that defense counsel's record of the statement by the witness Charles Jones was non-discoverable as "work product" within *Hickman v. Taylor, supra,* 329 *U. S.* 495, 67 *S. Ct.* 385, 91 *L. Ed.* 451. That was a civil case arising in the federal courts and, though it was admittedly concerned with pretrial discovery of written statements of prospective witnesses, it did not enunciate any constitutional principle and has no controlling force on the actual issue before us. *See* Note, " 'Work Product' in Criminal Discovery," 1966 *Wash. U. L. Q.* 321; *see also* 62 *Mich. L. Rev.* 1199 (1964); 35 *Tenn. L. Rev.* 474 (1968). Its main design was to afford a measure of protection to the attorney's privacy against pretrial disclosure of his litigation strategies, his mental processes and the like; it has led to varying interpretations and to much controversy. *See* 4 *Moore, Federal Practice, supra,* § 26.23 at 1315 *et seq.* (1961); "Developments in the Law—Discovery," 74 *Harv. L. Rev.* 940, 1027 *et seq.* (1961). Our own civil practice rule, *R.* 4:10–2, affords a comparable qualified privilege with respect to writings obtained or prepared by the attorney "in anticipation of litigation and in preparation for trial." We need not deal here with its precise scope and effect although we note, as the court did recently in *Dougherty v. Gellenthin,* 99 *N. J. Super.* 283 (*Law Div.* 1968), that since it represents an exception to the modern embracement of broad discovery as an aid to truth and justice, it is "to be construed very narrowly." 99 *N. J. Super.* at 287. *See Monier v. Chamberlain, supra,* 221 *N. E.* 2d at 416–17; *see also* Freund, "Work Product," 45 *F. R. D.* 493, 496–97 (1967), where the author, after referring to the belief that the *Hickman* doctrine has resulted in the overprotec-

tion of the statements of prospective witnesses, expressed the following thoughts: "Where a party intends to call a witness from whom he has a statement, the statement represents potential evidence for purposes of impeachment. The search for truth is likely to be fostered, and the testimony more measured and balanced, if all relevant parties have access to the statement—the witness, the examiner and the cross-examiner." *Cf. In re Richardson*, 31 *N. J.* 391, 396 (1960); *In re Selser*, 15 *N. J.* 393, 405 (1954); 2 *Schnitzer & Wildstein, New Jersey Rules Service* AIV–446 *et seq.* (1954).

Our criminal practice discovery rules did not include the quoted language from our civil practice rule, *R.* 4:10–2, nor did they accept the *Hickman* approach to statements of prospective witnesses. Thus *R.* 3:13–3(c) explicity provides that, absent a showing of good cause to the contrary, the court shall direct the prosecuting attorney to permit the pretrial inspection of the statements of his prospective witnesses; and under *R.* 3:13–3(d) the court may direct the reciprocal pretrial disclosure of the statements by the defendant's prospective witnesses. *R.* 3:13–3(e) sets forth that apart from witnesses' statements as above provided, the "reports, memoranda or internal documents" of the prosecution and the defense are not subject to pretrial discovery. This restricted work product privilege was not carried over into the criminal practice rules dealing with disclosure at trial (*R.* 3:17) though we may assume that its underlying policy considerations will be honored at trial to the extent that they are there applicable. Thus the internal office materials which embody the attorney's private thoughts and impressions, as distinguished from the statements of witnesses, would be nonevidential and protected by the privilege.

We find no merit in the defendant's argument that the attorney's record of his interview with Charles Jones did not constitute a statement of a witness within the trial discovery principles set forth earlier in this opinion.

It was an objective presentation of Jones' statements to the attorney without embellishment and, although some of it was in third rather than first person, the crucial items which formed the basis of the prosecutor's cross-examination were in quotations and were represented as literally exact statements by Jones to the attorney. There were no private or confidential comments by the attorney nor were there any specific indications of the attorney's mental impressions or prospective trial strategies; if there had been they could readily have been exscinded under the trial court's supervision before any inspection by the prosecuting attorney. *Cf. Saunders v. United States,* 114 U. S. App. D. C. 345, 316 *F.* 2d 346, 350 (*D. C. Cir.* 1963). The document appeared to be one which might equally have been recorded by a clerk, investigator or other non-attorney and when it was shown to Jones on the witness stand he read it and unequivocally said it was his statement. At that point the trial court ruled that the prosecuting attorney could inspect and use it in cross-examination. We are satisfied that this did not intrude on the defense attorney's privacy or operate unfairly insofar as the conduct of the defense was concerned; in holding that the trial court's ruling constituted reversible error, the Appellate Division itself erred.

In the course of its opinion the Appellate Division dealt with an error in the trial court's charge. 101 *N. J. Super.* at 488. After reciting the holdings in *State v. Fair,* 45 *N. J.* 77 (1965), *State v. Chiarello,* 69 *N. J. Super* 479 (*App. Div.* 1961), *certif. denied,* 36 *N. J.* 301 (1962), and *State v. Koonce,* 89 *N. J. Super.* 169 (*App. Div.* 1965), it found that the trial judge had not sufficiently informed the jury as to the defendant's right to intervene if it reasonably appeared to him and he so reasonably believed that Officer Nance was engaged, not in subduing unlawful resistance to arrest, but in unlawfully beating his niece because of her taunts. The trial judge erroneously told the jury that the defendant could not prevail on his asserted defense that he had reasonably intervened to protect his niece if, regardless

of the appearances and his beliefs, there had in fact been an arrest by Officer Nance and Lilliteen was actually resisting arrest.

In *State v. Koonce, supra,* the Appellate Division held that where a private citizen is being arrested by "one he knows or has good reason to believe is an authorized police officer engaged in the performance of his duties" (89 *N. J. Super.* at 184), he has no right physically to resist whether the arrest be legal or illegal. *See 7 Natural Resources J.* 119 (1967) ; *cf.* 78 *Yale L. J.* 1128 (1969) ; 83 *Harv. L. Rev.* 626 (1970). However, in *State v. Mulvihill,* 105 *N. J. Super.* 458 (*App. Div.*), *certif. granted,* 54 *N. J.* 560 (1969), the same court recognized the officer's responsibility to refrain from excessive and unnecessary force and the right of the accused to protect himself reasonably against serious bodily harm from such improper force. *See People v. Curtis, Cal.,* 74 *Cal. Rptr.* 713, 450 *P. 2d* 33, 38–39 (1969) ; *cf. State v. Williams,* 29 *N. J.* 27, 39 (1959) ; *E. Fisher, Laws of Arrest* 295 (1967).

In *State v. Chiarello, supra,* the Appellate Division dealt comprehensively with the principles governing the right of a third party to intervene in defense of another. It rejected the "alter ego" rule under which the right of a person to intervene in the defense of another is simply coextensive with the legal rights of the other to defend himself ; instead, it adopted the more just rule under which one may in reasonable manner intervene to protect another where it reasonably, even though mistakenly, appears to him that such other person is being unlawfully assaulted. 69 *N. J. Super.* at 485–95. In *State v. Fair, supra,* this Court expressly approved the holding in *Chiarello.* The defendants Lynn and Fair were charged with having murdered Rudesel. There was testimony that Lynn had intervened to protect Fair from Rudesel and Lynn urged on appeal that the trial court had erroneously failed to charge on the subject. In his opinion for the Court, Justice Haneman agreed, pointing out that the jury could properly have

found "that Lynn became involved in the affray in order to defend Fair against what appeared to him to be the murderous onslaught of a drunken man wielding a knife." 45 *N. J.* at 93. The *Fair* opinion noted that New Jersey had solidly aligned itself with those jurisdictions which afford a defense to one who intervenes in reasonable manner to protect one who reasonably appears to him to be the victim of an unlawful assault; such intervenor has been said to lack the requisite *mens rea* for criminality (*Chiarello,* 69 *N. J. Super.* at 494) and affording him a legal defense has been buttressed by current considerations of policy and justice (*Fair,* 45 *N. J.* at 93).

 Neither *Fair* nor *Chiarello* involved a police officer and to that extent they may be differentiated from the case before us. *Cf. United States v. Grimes,* 413 *F. 2d* 1376 (7 *Cir.* 1969). Here the affray involved a police officer in full uniform. That in itself did not obviate the possibility that the officer was using excessive and unnecessary force or that he was engaged in a private altercation rather than in the bona fide performance of his police duties. But that would not be the normal inference and, with that in mind, anyone intervening in restraint rather than in aid of the officer would fairly be called upon to justify his conduct by adequate supporting evidence that it reasonably appeared to him and he so reasonably believed that the officer, though uniformed, was not engaged in the bona fide performance of his police duties but was actually committing an unlawful assault. The intervenor's mere naked assertion of such appearance and belief, without more, could not as a matter of sound policy be deemed sufficient to take the defense to the jury. However, here there was something more, for there was enough affirmative testimony favorable to the defendant from which a jury could properly have found that the circumstances reasonably indicated to the defendant and he so reasonably believed that Officer Nance had not actually arrested Lilliteen and was not in the process of subduing her resistance to the

arrest, but was actually administering a beating to her because of the scurrilous remarks which she admittedly had made.

Even if the jury had been suitably instructed and had found justification for the defendant's original intervention, that justification would, under the evidence, clearly not have carried over to his later conduct. The defendant admitted that he took the officer's gun and, in the light of the jury's finding, it must be taken that the defendant thereafter pointed it at the officer and threatened to shoot him. That conduct highly endangered not only Officer Nance but all of the other persons in the near vicinity including the defendant himself; indeed one of the other officers testified that when he reached the scene and saw the defendant with the gun in his hand pointed at Officer Nance, he was about to shoot the defendant but Officer Nance "jumped him" instead. Clearly, the pointing of the gun at the officer and the threatening of his life were not defensive steps, for the officer had already called for police assistance and if, as the defendant testified, he really was afraid of returning the gun to the enraged officer, he could, with safety to himself and the others, have pocketed it, placed it out of reach, or have withdrawn further while awaiting the arrival of the other officers *Cf. State v. Abbott*, 36 *N. J.* 63, 68–73 (1961). Surely an orderly society may not tolerate the described after conduct of the defendant even though in its high solicitude for the protection of individual rights it permits a finding of justification of his earlier conduct. We are entirely satisfied that, although the defendant's conviction for assault and battery must be set aside because of the error in the charge, his conviction for threatening the life of the police officer by pointing a revolver at him in violation of *N. J. S.* 2A:113–8 must stand.

There were two additional points raised by the defendant before the Appellate Division. He contended that the offense of threatening the officer's life in violation of *N. J. S.* 2A:113–8 was preempted by the more specific statute (*N. J. S.* 2A:90–4) condemning an assault and

battery upon a police officer. That contention was properly rejected by the Appellate Division (101 *N. J. Super.* at 489) and was not renewed in the brief or argument on the defendant's behalf before us. The defendant also contended that his sentences, which aggregated not less than three nor more than five years in State Prison, were manifestly excessive. The Appellate Division summarily rejected this contention with the comment that "since the statutory maximum for these offenses was 22 years" it found "no abuse of discretion." 101 *N. J. Super.* at 489. But the mere fact that the statutory limit grossly exceeds the sentence is by no means dispositive on appeal. *Cf. State v. Hicks,* 54 *N. J.* 390, 392 (1969); *State v. Bess,* 53 *N. J.* 10, 18 (1968). The defendant had no prior involvement with the law and the imposition at trial of lesser imprisonment might well have suitably served all interests concerned. However we need not pursue the matter since our setting aside of the conviction under *N. J. S.* 2A:90–4 leaves the defendant with a permissible sentence of 1 to 2 years for violation of *N. J. S.* 2A:113–8; and though the prosecution may still have discretion to retry the defendant under *N. J. S.* 2A:90–4, we consider that course unlikely, as a practical matter, in view of all of the pertinent circumstances.

The judgment of the Appellate Division is Modified to the end that the conviction for violation of *N. J. S.* 2A:90–4 is set aside but the conviction for violation of *N. J. S.* 2A:113–8, including the sentence thereunder, is in all respects sustained.

*For modification* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—NONE.