STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. SAMUEL LEE WILLIAMS, DEFENDANT-RESPONDENT.

Argued May 8, 1979—Decided July 6, 1979.

474

Mr. *Anthony J. Parrillo,* Deputy Attorney General, argued the cause for appellant (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

Mr. *Ezra D. Rosenberg,* Designated Counsel, argued the cause for respondent (*Mr. Stanley C. Van Ness,* Public Defender of New Jersey, attorney).

The opinion of the court was delivered by

SULLIVAN, J. █ Defendant was convicted of entry without breaking with intent to rob, assault with intent to kill and armed robbery. He was sentenced, in the aggregate, to a minimum term of thirty and one-half years and a maximum of thirty-seven years, to be served in State Prison. On appeal, the Appellate Division, in an unpublished opinion, reversed his conviction on the ground that certain discovery granted the State pursuant to *R.* 3:13–3(b)(4) was contrary to our recent holding in *State v. Mingo,* 77 *N. J.* 576 (1978). The discovery related to information received and photographs used in an interview which defense counsel and his investigator had with the victim during which she identified a photograph of defendant.

The Appellate Division ruled that the discovery rule did not extend to such material in defense counsel's file which the defense did not intend to use at trial. Otherwise, the Appellate Division said, it would intrude upon the defendant's right to have the effective assistance of counsel. Certification was granted, 79 *N. J.* 485 (1979), to review this question. We affirm.

The criminal episode involved the March 22, 1976 armed robbery of an Army-Navy store in Elizabeth. The victim was alone in the store when a young man entered, displayed a knife and, after robbing the victim, stabbed her several times as she knelt on the floor praying. Defendant was arrested about two months later and charged with the crime.

Defense counsel and his investigator, in their preparation of the case, interviewed the victim on two occasions and showed her several photographs. On May 25, 1976, the first occasion, when shown a photograph of someone other than defendant, she said that he had "the features of the man who could have done it" but did not identify him as her attacker. However, on June 17, 1976, when defense counsel showed her three other photographs, she selected defendant's as that of her assailant.

Prior to trial the State moved for reciprocal discovery of the photographs shown the victim and the memoranda made of such interviews. Defense counsel objected on the ground that he did not intend to use this material at trial. However, the trial court granted the motion. A defense motion for leave to appeal was denied.

After receiving the material, the State served notice on defense counsel and his investigator that they were being subpoenaed to testify as State's witnesses at defendant's trial. On a motion to quash the subpoenaes, the trial court ruled that under the circumstances the issue did not involve the attorney-client privilege and that if the facts could not otherwise be adequately conveyed to the jury, he would allow defense counsel and the investigator to be called as State's witnesses. His objection having been noted, defense counsel, in order to avoid having to testify, then entered into a stipulation as to the facts of his June 17 interview with the victim and the photographs shown to her.

At trial, the State, in addition to having the victim identify defendant in court, also brought out her identification of a photograph of defendant shown her by defense counsel at

the June 17, 1976 interview he had with her.[1] The State also entered on the record defense counsel's stipulation as to the June 17 interview and placed into evidence the photographs displayed at that time. The prosecutor, in summation, repeatedly emphasized not only this out-of-court identification but also the fact that it was obtained by defendant's own attorney, saying:

> Mrs. Santullo was shown photographs many times and was unable to make an identification. When she did finally identify the defendant — and she did identify the defendant — but it wasn't the police that showed her the picture. Mr. Waldman, the defense attorney, showed her the picture which she identified on June 17 as the defendant Samuel Williams. You think Mr. Waldman wanted her to identify that picture?
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> That wasn't police work, that was Mr. Waldman's work when she identified the picture of Samuel Williams.

After the jury had retired to deliberate, it submitted a question to the court, answered by stipulation of the parties, regarding which photographs the defense had shown the victim and the dates they were shown. A verdict of guilty was returned thereafter.

■ We conclude that the trial court, in extending the criminal reciprocal discovery provisions of *R.* 3:13–3 to inculpatory material which defense counsel had in his file, trespassed on defendant's right to effective assistance of counsel. The material was obtained during defense counsel's preparation for trial and, since it was inculpatory, counsel obviously did not intend to use it at trial.

---

[1] The State also introduced into evidence a written statement signed by defendant admitting to the crime. Defendant disputed the voluntariness of the statement on the ground he had been promised a dose of methadone if he confessed to the robbery and stabbing. Following a *voir dire* hearing the trial court ruled the statement to be admissible.

The reciprocal discovery provision in *R.* 3:13–3 is sound. Its thrust is that the State is entitled to know in advance what evidence a defendant intends to use at trial so that it may have a fair opportunity to investigate the veracity of such proof. To that end, as set forth in paragraph (b) of the rule, the State is entitled to discovery of the following which are within the possession, custody or control of defense counsel:

(1) results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the matter or copies thereof, * * *;

(2) any relevant books, papers, documents or tangible objects, * * *;

(3) the names and addresses of those persons known to defendant whom he may call as witnesses at trial and their written statements, if any, including memoranda reporting or summarizing their oral statements;

(4) written statements, if any, including any memoranda reporting or summarizing the oral statements, made by any witnesses whom the State may call as a witness at trial.

[*R.* 3:13–3(b)]

■ It is this last category which the State contends entitles it to the material here at issue. We conclude that the State reads this sub-paragraph too literally. The purpose of sub-paragraph (4) is to avoid having the State confronted at trial for the first time with written statements or summaries of oral statements of its own witnesses which may be used to attack the veracity of the witnesses' courtroom testimony. Discovery of such statements, or summaries, which defendant intends to use at trial, is entirely proper.

■■ However, this sub-paragraph does not give the State access to statements or summaries of statements made by its witnesses to defense counsel during defense preparation for trial if defense counsel does not intend to use them at trial. To hold otherwise would infringe on a defendant's constitutional right to the effective assistance of counsel because of the chilling effect it would have on defense investigation. Defense counsel would be hesitant to make an in-depth in-

vestigation of the case for fear that inculpatory material would be disclosed which might have to be turned over to the State. Once counsel has determined not to use such statements of a State's witness at trial, the material is entitled to the protection of paragraph (c) of *R.* 3:13–3. That paragraph specifically protects certain items from discovery:

(c) Documents Not Subject to Discovery. This rule does not require discovery of a party's work product consisting of internal reports, memoranda or documents made by that party or his attorney or agents, in connection with the investigation, prosecution or defense of the matter nor does it require discovery by the State of records or statements, signed or unsigned, of defendant made to defendant's attorney or agents.

The investigative course selected by an attorney in order to prepare a proper defense for his client frequently entails a high order of discretion. This often calls for more than simple fact gathering. Evidential materials obtained in the exercise of this professional responsibility are so interwoven with the professional judgments relating to a client's case, strategy and tactics that they may be said to share the characteristics of an attorney's "work product." Blanket discovery of the fruits of this kind of legal creativity and preparation may impact directly upon the freedom and initiative which a lawyer must have in order to fully represent his client. *State v. Mingo, supra.* Curtailment or inhibition of this attorney function by discovery, not otherwise justified to avoid trial surprise, would permit the State to undermine the effectiveness of an attorney in serving his client.

It is abhorrent to our concept of criminal justice to compel a defendant, under the guise of reciprocal discovery, to disclose to the State inculpatory evidence uncovered by defense counsel during his preparation for trial and then allow the State to use that evidence as part of its case in chief. That is exactly what happened in this case. Identification of defendant by the victim was critical to the State's case. The victim had not made any photographic or

other out-of-court identification of defendant to the police. Her sole identification was in court some ten and one-half months after the crime had been committed. The State, in order to bolster the witness's identification, had her testify that she had selected a picture of defendant out of several photographs shown her by defense counsel. While this testimony by the victim was proper, the State then put on the record the stipulation by defense counsel as to the facts of his interview with the victim. The State also had marked into evidence the photographs in question used by defense counsel at the time.

The importance of this identification is obvious. The prosecutor, in summation, emphasized that it had been made to defense counsel and not to the police. The one question which the jury asked after it retired to deliberate concerned the photographs shown the victim by defense counsel. Under the circumstances, the compelled discovery and the use to which it was put cannot be said to have been harmless error.

Our recent decision in *State v. Mingo, supra,* supports the conclusion we reach herein. *Mingo* involved an inculpatory report by a handwriting expert retained by the defense. Although defendant obviously did not intend to use the expert at trial, the State compelled disclosure of the report under *R.* 3:13-3(b)(1) and then called the expert as a State's witness.

In *Mingo* we ruled that *R.* 3:13-3(b)(1) did not require discovery of an expert's report which the defense did not intend to use at trial and that to hold otherwise would subvert a defendant's constitutional right to effective assistance of counsel. In so ruling we referred to a defense attorney's right to seek out expert evidence in aid of the defense without risking its disclosure to the State if for any reason the expert's opinion turns out to be unfavorable.

Our holding in *Mingo,* however, was limited "to reports of opinions of expert witnesses" 77 *N. J.* at 585. As to discovery of defense material "of any other nature" we referred to *United States v. Nobles,* 422 *U. S.* 225, 95

*S. Ct.* 2160, 45 *L. Ed.* 2d 141 (1975) and *State v. Montague,* 55 *N. J.* 387 (1970). 77 *N. J.* at 585. The rationale of both of those cases fully supports our decision extending the holding in *Mingo* to the facts of this case.

In *State v. Montague, supra,* this Court stated that our discovery rules must be interpreted to permit the State "to inspect the prior statement of a witness who has *testified for the defense."* 55 *N. J.* at 400–401 (emphasis added). We also recognized that the trend toward "broader mutual discovery" is restricted by constitutional limits. *Id.* at 401. We believe, as indicated above, that those limits were exceeded by the discovery permitted in this case.

*United States v. Nobles, supra,* is also persuasive authority for our holding.[2] In that case, defense counsel intended to call his investigator as a witness for the purpose of impeaching several prosecution witnesses, yet resisted discovery of the investigator's memoranda of interviews with those witnesses. 422 *U. S.* at 231–232, 95 *S. Ct.* at 2166–2167, 45 *L. Ed.* 2d at 150. The court held that the defense had no right to withhold relevant portions of the investigator's reports since, by calling him as a witness, defense counsel had waived any privilege not to disclose the material which might otherwise have been available. *Id.* at 236–240 & n.15, 95 *S. Ct.* at 2169–2171 & n. 15, 45 *L. Ed.* 2d at 152–154. It was implicit in the court's analysis that the material would not have been discoverable had defense counsel elected not to call the investigator as a witness or utilize his reports in any way at trial. See *id.* This is precisely the position which we endorse today.

Prosecuting attorneys should not fear that our decision today may prompt defense attorneys to delay decisions as to whether or not to utilize statements of a State's witness until the trial has commenced, thus giving the defendant

---

[2] As no constitutional principle on the issue presented herein was enunciated in the case it is not controlling.

an unfair advantage. Such "mid-stream" decisions can be met by reference to *R.* 3:13–3(f) which gives the trial court ample authority to remedy situations in which there has been a failure to disclose material which is, or which becomes, discoverable. Such remedies include prohibiting the use of the material at trial.

In summary, we hold that *R.* 3:13–3(b) ,(4) applies to written statements or memoranda reporting or summarizing the oral statements made by any witness whom the State may call as a witness at trial only in a situation where the defense intends to use the statement or memoranda at trial.

Affirmed.

SCHREIBER, J., dissenting. The criminal discovery rules, notably *R.* 3:11 (Notice of Alibi; Particulars), *R.* 3:12 (Notice of Defense of Insanity), and *R.* 3:13 (Pretrial; Depositions; Discovery) were designed[1] principally for the purpose of presenting at trial all relevant and material evidence *to assist the fact finder in the search for the truth.*[2] To that end neither party, prosecution nor defense, may validly deny, in the words of Chief Justice Traynor, "access to evidence that can throw light on issues in the case." *Jones v. Superior Court,* 58 *Cal.* 2d 56, 59, 22 *Cal. Rptr.* 879, 880, 372 *P.* 2d 919, 920 (1962).

In *State v. Montague,* 55 *N. J.* 387 (1970), Justice Jacobs, vigorously affirming these principles, traced the development of our discovery rules and in that case broadened discovery to include the prosecutor's right to inspect the prior statement of a witness for the defense. He commented that:

---

[1]Authority for promulgating discovery rules in the criminal area stems from the Court's inherent power to order discovery when justice so requires, *State v. Hunt,* 25 *N. J.* 514, 530–531 (1958), and the Court's rule making power.

[2]Prevention of surprise, elimination of gamesmanship, and affording a party an opportunity to obtain evidence and research law in anticipation of the trial are other objectives of adequate pretrial discovery.

This step will be fully compatible with the trend of our pretrial discovery rules which, as we have already indicated, are significantly geared towards broader mutual discovery within constitutional limits. [*Id.* at 401]

*R.* 3:13–3 (Discovery and Inspection) reflected until today the continuing effort of this Court to fulfill the philosophy of broad discovery as an aid to truth and justice. This particular discovery rule does not come into play until and unless the defendant decides that it should. Thus, it is only *after* the defendant seeks discovery under the rules,[3] including disclosure of the

names and addresses of any persons whom the prosecuting attorney knows to have relevant evidence or information including a designation by the prosecuting attorney as to which of those persons he may call as witnesses [*R.* 3:13–3(a)(7)],

that the defendant must permit the State to inspect

written statements, if any, including any memoranda reporting or summarizing the oral statements, made by any witnesses whom the State may call as a witness at trial. [*R.* 3:13–3(b)(4)]

Note that the defendant need disclose statements only of witnesses the State may call at trial, not of all persons whom he knows to have relevant information.

---

[3]The defendant is, of course, entitled to certain limited information exclusive of the operation of *R.* 3:13–3. See *Brady v. Maryland*, 373 *U. S.* 83, 83 *S. Ct.* 1194, 10 *L. Ed.* 2d 215 (1963); *State v. Carter*, 69 *N. J.* 420 (1976). Due process requires the State to disclose "evidence that affirmatively tends to establish a defendant's innocence" and evidence impeaching the credibility of a State's witness. *State v. Carter*, 69 *N. J.* at 433. See 8 *Moore's Federal Practice* ¶ 16.08[2], at 122 (2d ed. 1978), suggesting that under the federal rules regarding reciprocal discovery, *Fed. R. Crim. P.* 16 (b)(1), the government's right of discovery is not triggered if defendant requests only information to which he is constitutionally entitled.

The material which the prosecution sought here, the memoranda reporting the victim's oral statements given to defense counsel, fell squarely within *R.* 3:13-3(b)(4). Defendant had triggered the discovery mechanism by demanding that the prosecutor notify him of the names and addresses of those whom the State might call as witnesses. The State furnished the name and address of the victim; thereafter, the defendant's counsel and investigator interrogated the victim on two occasions and prepared memoranda reporting the oral statements made. The rule clearly and unambiguously required that these memoranda be disclosed to the State.

Compliance with the rule furthered its spirit and purpose. Furnishing such information advanced the process of presenting all material and relevant data to the jury and judge. Permitting one party to frustrate that goal because the information is adverse to his position conflicts with the hitherto well established end of pretrial discovery.

The only limitations, other than those expressed in the rules, which we have placed on discovery of this nature have been those mandated by the constitution. In *State v. Mingo,* 77 *N. J.* 576 (1978), we refused to permit the State to obtain and use the opinion of the defendant's expert. We predicated that result on the constitutional right of effective assistance of counsel implicit in the Sixth Amendment to the United States Constitution and Art. I, par. 10 of the New Jersey Constitution, relying on the theory expressed in *United States v. Alvarez,* 519 *F.* 2d 1036 (3 Cir. 1975), that "[t]he attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness." *Id.* at 1047. Here that potential did not exist. The State had previously designated the victim as a proposed witness.

Nor can it justifiably be argued that enforcement of *R.* 3: 13-3(b)(4) is unconstitutional because it would make defense counsel hesitate before interrogating a State's witness. Experienced members of the trial bar consistently demand

that they be advised of what every witness will likely testify to at the trial. Good lawyering calls for no less.[4] Furthermore, since the witness could properly testify at the trial with respect to defense counsel's interview, as the majority concedes,[5] the pretrial disclosure would not have a significant effect on counsel's decision to question the witness. Counsel have cited no case and our research has disclosed none which has upheld the contention that requiring disclosure of a witness's statement, the name having been given in the first instance by the State, has risen to an infringement of a defendant's constitutional right to effective assistance of counsel. But cf. *In re Terkeltoub*, 256 *F. Supp.* 683, 685 (S.D.N.Y. 1966) (suggesting that requiring defense counsel to answer questions before the grand jury concerning a meeting he had attended with his client and a prospective government witness during the preparatory stages of a case might infringe upon the client's Sixth Amendment rights).

---

[4]This point has been well stated in the commentary to the *ABA Project on Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial* (Approved Draft, 1970) :

Generally, an attorney can be effective in a trial only to the extent that he has the information necessary to plan effectively. Quick wits may be the mark of the trial lawyer, but they are not always sufficient for the orderly exposition and testing of evidence, which is the purpose of a trial. Where planning is foreclosed by lack of information, as has long been the custom in much of criminal litigation, surprise and gamesmanship usually govern the conduct of the proceedings. The result is too often a general obfuscation of the issues. In spite of its obvious entertainment qualities, trial gamesmanship by way of obfuscatory tactics is generally offensive to the dignity of the court as an institution and destructive of respect for legal processes. Where life, liberty and protection of communities from crime are the stakes, gamesmanship is out of place. [*Id.*, § 1.1, comment c at 31]

[5]As distinguished from *State v. Mingo, supra,* in which none of the expert's testimony was admissible. 77 *N. J.* at 586–587.

For a discussion of the relationship between effective assistance of counsel and disclosure by defendant in a slightly different context, see Pulaski, "Extending the Disclosure Requirements of the Jencks Act to Defendants: Constitutional and Nonconstitutional Considerations," 64 *Iowa L. Rev.* 1, 26–39 (1978).

The most commonly asserted constitutional protection invoked by defendants in this area has been the Fifth Amendment privilege against self-incrimination. The United States Supreme Court in *United States v. Nobles,* 422 *U. S.* 225, 95 *S. Ct.* 2160, 45 *L. Ed.* 2d 141 (1975), has held that privilege to be inapplicable to statements obtained from witnesses. Even requiring a defendant to provide various types of evidence personal to himself has withstood constitutional attack. *E. g., Schmerber v. California,* 384 *U. S.* 757, 86 *S. Ct.* 1826, 16 *L. Ed.* 2d 908 (1966) (blood sample taken from defendant); *United States v. Dionisio,* 410 *U. S.* 1, 93 *S. Ct.* 764, 35 *L. Ed.* 2d 67 (1973) (defendant forced to give voice exemplars); *Gilbert v. California,* 388 *U. S.* 263, 87 *S. Ct.* 1951, 18 *L. Ed.* 2d 1178 (1967) (defendant can be compelled to give handwriting samples); *State v. Macuk,* 57 *N. J.* 1 (1970) (defendant forced to submit to chemical test to determine level of alcohol in blood). See 8 *Wigmore, Evidence* § 2265 (McNaughton rev. 1961), for an extensive list of nontestimonial compulsions directed to the defendant which are not violative of the privilege against self-incrimination. The majority does not rely upon the Fifth Amendment and I advert to it because the case law does support the notion that a defendant may be compelled to disclose to the State inculpatory evidence which the State may use in its direct case.

Lastly, if there were error, which I do not concede, it was at most harmless. The victim, a 48-year-old widow, owned and operated an Army and Navy store in a business section of Elizabeth. While alone in the store in the early afternoon, a man entered and asked to see a snorkel jacket. Sensing trouble, she replied she had none inside the store but perhaps there was one in the window. As she neared the front door,

he, displaying a knife in one hand, said this was a holdup and demanded her money. She said, "I'll give you the money but don't hurt me." She then opened the cash register and gave him its contents of about $60.

The robber then directed her to the back of the store. She thought he was going to lock her up in the bathroom, but when they were halfway to the back he directed her to lie down. Fearing for her life, she fell to her knees, and started to pray the Our Father. He stabbed her on the neck. She pleaded, "I don't have a husband, I have five youngsters, business is bad, I'm trying to make a living for them. Don't kill me." Her assailant then stabbed her in four places in her chest and on her left arm. He ran out of the store and she struggled to reach the next door store and collapsed. Help was called and she was taken to the hospital where she remained for three to four weeks. This was followed by a lengthy post-operative therapy at a nursing home.

The crime occurred on March 22, 1976. While being treated in the hospital emergency room, she described her assailant as best she could to a detective. Efforts to identify her assailant by looking through police photographs while at the hospital proved fruitless. Shortly after the police obtained a confession from defendant in May, a detective visited her at the nursing home. On that occasion she was shown a series of photographs, including one of defendant. She was unable to identify him, but at the time was under medication and in severe pain.

Subsequently, the defense attorney and an investigator visited the victim on two occasions. On the first, May 25, 1976, they showed her one picture, which was not that of defendant. She said the photo was "very similar" to her assailant and "could be him, the more I look at it." When they returned on June 17, 1976 with three photographs, the defendant's and his two brothers', she identified the defendant. (It is the disclosure of the reports of these two meetings and the photographs which is at issue.)

At the trial she had no difficulty in identifying defendant, for when she saw him in court his eyes brought everything back to her. When asked on cross-examination to explain what it was about defendant's eyes which impressed her, she replied:

> I said his eyes, I can't find the words, but they are like deep and quiet, subtle. I don't know what words to use. As I said, they are not big. Some people have big eyes. I can't explain, but it's just when I saw him it rang a bell, his eyes are what recalled it to me then, "This is the one."

The trial court charged the jury that

> unless the in-court identification resulted from the observations or perceptions of the defendant by [the victim] which she made during the commission of the crime rather than being the product of an impression gained at the out-of-court identification procedure, it should be afforded no weight.

The victim's in-court identification evidence coupled with the trial court's charge, the admittedly proper testimony of the victim to the interview with the defense counsel, and defendant's confession constitute such overwhelming proof of guilt that any error concerning the discovery of defendant's photograph and the statement obtained by defense counsel and his investigator was harmless.

I would reverse and reinstate the judgment of conviction.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and HANDLER —6.

*For reversal and reinstatement*—Justice SCHREIBER—1.