275 N.J. Super. 311 (1994)
646 A.2d 431
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT-CROSS-APPELLANT,
v.
JOHN C. DEMARCO, DEFENDANT, AND EDWARD T. BLAKE, D. CRIM., INTERVENOR-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1993.
Decided January 6, 1994.
*312 Before Judges GAULKIN, D'ANNUNZIO and WALLACE.
Barry C. Scheck, admitted pro hac vice, argued the cause for intervenor-appellant (Zulima V. Farber, Public Defender, attorney; Ruhnke & Barrett, Designated Counsel; Mr. Scheck, Lawrence A. Vogelman, Ellen Yaroshefsky and Peter J. Neufeld, on the brief).
Gilbert G. Miller, Assistant Prosecutor, argued the cause for respondent-cross-appellant (Nicholas L. Bissell, Jr., Somerset County Prosecutor, attorney; Mr. Miller and James R. Wronko, Assistant Prosecutor, of counsel and on the brief; James L. McConnell, Assistant Prosecutor, and Erwin K. Smith, Assistant Prosecutor, on the brief).
Jean D. Barrett argued the cause for defendant John C. DeMarco (Zulima V. Farber, Public Defender, attorney; Ruhnke & Barrett, Assigned Counsel; Ms. Barrett, on the brief).
*313 Alan L. Zegas submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey.
PER CURIAM.
The issue is whether the State may compel discovery of reports prepared by the defendant's expert witness for other clients in unrelated cases. The issue arises on the appeal of the expert witness, pursuant to leave granted, from an order denying his motion to quash a subpoena. We now reverse that order.
Defendant's first trial for capital murder and other related crimes, held in March 1993, ended in a mistrial due to the jury's deadlock during the guilt phase. Jury selection for defendant's retrial was interrupted when we granted leave to appeal.
Defendant John DeMarco is charged with the murder of his girlfriend, Karen DeStefanis. The victim's nude body was found by a hunter in a remote area of Hillsborough Township in December, 1990. She had been stabbed at least twenty times.
During the autopsy, the medical examiner took specimens from the victim's body for microscopic analysis. Among those specimens were fluids obtained by swabbing the oral, vaginal and anal orifices. One of the oral swabs revealed the presence of semen. These results were reported to the Somerset County Prosecutor's Office, which subsequently forwarded the swabs and slides to the FBI for DNA analysis. See United States v. Jakobetz, 955 F.2d 786 (2d Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992), and State v. Cauthron, 846 P.2d 502 (Wash. 1993), for explanations of DNA typing for purposes of identification.
The FBI utilized what is known as the RFLP DNA test procedure. This procedure examines the cells which are contained in the evidence samples and requires a relatively large amount of specimen to obtain a useful result. On May 23, 1991, the FBI issued a report concluding that the semen specimen could not be analyzed because the DNA was "degraded and/or insufficient." *314 The exhibits were returned to the Somerset County Prosecutor's office and made available to defense counsel by order of the trial court.
Defense counsel retained the services of Dr. Edward Blake of Forensic Science Associates, Richmond, California, to conduct DNA testing on the sperm-bearing swab. Dr. Blake used a technique known as Polymerase Chain Reaction (PCR). The PCR technique involves extraction of DNA material from the evidence, and amplification of the DNA material to obtain a sample sufficient for typing purposes. See State v. Williams, 252 N.J. Super. 369, 599 A.2d 960 (Law Div. 1991), for a description of the PCR technique and Dr. Blake's role in that case in behalf of the State.
Dr. Blake identified semen on the oral swab, extracted a minute amount of DNA material from the swab, amplified the extracted DNA material and examined it. As a result of his analysis, Dr. Blake concluded in his report that defendant "can not be the source of the sperm recovered from the DeStefanis oral swab." Dr. Blake's report was received by defense counsel in September 1992.
Dr. Blake testified in defendant's behalf at the first trial in March 1993. On June 18, 1993, Assistant Prosecutor James Wronko, who had tried the case for the State, wrote to Dr. Blake requesting that he provide the State with "copies of your reports for all criminal cases in which you have conducted PCR DQ Alpha testing on behalf of either the State or the defense." By letter dated June 21, 1993, Dr. Blake responded that he would not honor this demand as it was an "inappropriate invasion of my professional practice."
On June 25, 1993, Wronko, without notice to Dr. Blake, issued a subpoena duces tecum to Roche Molecular Systems, Inc. (Roche), requesting that it turn over case file reports prepared by Dr. Blake and in Roche's possession. The State sought the reports "specifically to locate additional cases wherein Blake's test results indicated the existence of unexplained contamination in either evidentiary or reference samples."
*315 The reports were apparently in the possession of Dr. Henry Erlich, the current director of Roche's Department of Human Genetics. Dr. Erlich and his colleagues developed the DNA technology utilized by Blake in this case. See State v. Williams, supra, 252 N.J. Super. at 381, 599 A.2d 960. Between 1987 and 1991, Blake "scientifically collaborated" with Erlich and other members of his laboratory with respect to the PCR HLA DQ Alpha technique and its relationship to forensic casework, and Blake would often send Erlich copies of his casework reports. The collaborations resulted in several articles on the topic. Dr. Erlich and his colleagues also acted as consultants to Dr. Blake on several occasions. Roche responded to the subpoena by turning over 234 case files to the State on September 13, 1993.[1]
On September 29, 1993, Blake moved to quash the subpoena, arguing that the case reports were protected from disclosure as work product and also under the attorney-client privilege. The trial court rejected these arguments, stating:
even if we accept as true that an attorney-client privilege, or some right of confidentiality exists, when these case reports were prepared by Dr. Blake and held by him, that right of confidentiality ceased when Dr. Blake sent those reports to Dr. Erlich, to Roche, or to other scientists who were not part of his staff and office.
When he delivered those case reports to another scientist, or another office outside of his own office, in my view, they enter the public domain, and they become subject to a subpoena duces tecum.
....
The Defendant here suggests that the disclosure of this data would severely jeopardize other capital Defendants, but no such case has been brought to the attention of this court. And if there were to be any such cases in which the disclosure of this material would severely jeopardize other capital Defendants or other Defendants, and that information was brought to my attention, I think that matter could easily be resolved by redacting the names of those particular Defendants, or litigants, from the files that could be used by the Prosecutor in this case.
....

*316 Accordingly, we find that there is no basis for Dr. Blake to bring this motion. We are unaware of any privilege given to Dr. Blake, once he has disseminated the information to other parties.
The court further held that Blake did not have standing to bring a motion to quash the subpoena. However, the court granted the motion to quash with respect to those "two or three" case reports where Mr. Scheck (Blake's attorney) was the attorney of record. The court stated that this was done to "protect his [Scheck's] right of privilege."
As previously indicated, we granted Dr. Blake's motion for leave to appeal. We also permitted counsel for DeMarco to participate in the appeal by filing a brief and presenting oral argument. The State's cross-motion for leave to appeal from that part of the order quashing the subpoena as to reports rendered to Mr. Scheck was also granted.
Counsel for Dr. Blake contends on appeal that his clients' case reports are privileged as attorney work product and are protected from disclosure by the attorney-client privilege. He also contends that disclosure of these reports would violate the Sixth Amendment right to effective assistance of counsel and that the reports prepared on behalf of law enforcement agencies are protected by a "law enforcement investigatory privilege."
Although we do not decide whether the asserted privileges apply in this case, we deem it necessary to discuss them and the policy considerations on which they are founded.
The attorney work product privilege prohibits disclosure of certain materials prepared by an attorney in anticipation of litigation, and thereby "creates a zone of privacy in which an attorney can investigate, prepare, and analyze a case." In re Grand Jury Subpoena Dated November 8, 1979, 622 F.2d 933, 935 (6th Cir.1980).
The work product privilege was recognized by the United States Supreme Court in Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Court observed that

*317 it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper presentation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.
[Id. at 510-11, 67 S.Ct. at 393, 91 L.Ed. at 462.]
In United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the Court acknowledged that the work product doctrine applies in criminal cases, and succinctly explained:
At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. [] [T]he doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.
[Id. at 238-39, 95 S.Ct. at 2170, 45 L.Ed.2d at 154.]
In New Jersey, the attorney work product privilege applicable to criminal cases is codified in R. 3:13-3(c), which provides:
Documents Not Subject to Discovery. This rule does not require discovery of a party's work product consisting of internal reports, memoranda or documents made by that party or his attorney or agents, in connection with the investigation, prosecution or defense of the matter nor does it require discovery by the State of records or statements, signed or unsigned, of defendant made to defendant's attorney or agents.
The privilege protects materials prepared by the attorney, as well as those prepared by agents of the attorney retained to aid in the preparation of a case. R. 3:13-3(c); Nobles, supra, 422 U.S. at 238-39, 95 S.Ct. at 2170, 45 L.Ed.2d at 154. In New Jersey, however, it has been held that "true work product" is material that is "inherently inadmissible." State v. Mingo, 77 N.J. 576, 585, 392 A.2d 590 (1978); accord State v. Montague, 55 N.J. 387, 402, 262 A.2d 398 (1970) ("the internal office materials which embody the attorney's private thoughts and impressions, as distinguished from the statements of witnesses, would be nonevidential and protected by the [work product] privilege"). Thus, a report of a defendant's handwriting expert, whom defendant did not intend to call as a witness, was not privileged work product "as it *318 constitutes a species of evidence admissible under some circumstances." Mingo, supra, 77 N.J. at 585, 392 A.2d 590. Dr. Blake's case reports fall into the same category and it is unlikely, therefore, that they would be protected work product under New Jersey law.[2]But cf. State v. Williams, 80 N.J. 472, 479, 404 A.2d 34 (1979) (memoranda by defense counsel summarizing interview of victim, and photographs used in interview, constituted protected work product when defendant did not intend to use those items at trial).
Dr. Blake and defendant also contend that disclosure of the 234 case reports would violate the attorney-client privilege that exists between the attorneys who retained Dr. Blake to prepare those reports and their clients. Dr. Blake is seeking to assert the privilege as an agent of the attorneys who retained him. The State counters that "the material reflected in the reports could not possibly be considered protected communications under the attorney-client privilege."
The attorney-client privilege protects against disclosure of confidential communications between the client and the attorney, made in the course of the professional relationship. See N.J.R.E. 504. The primary purpose of the privilege is to encourage full and frank communication of information from the client to the attorney. In re Advisory Opinion No. 544 of the New Jersey Supreme Court Advisory Committee on Professional Ethics, 103 N.J. 399, 405, 511 A.2d 609 (1986).
The privilege extends to necessary communications made by the client to an agent of the attorney, such as a scientific expert retained to aid in the preparation and presentation of the defense. State v. Kociolek, 23 N.J. 400, 413, 129 A.2d 417 (1957). Similarly, *319 the privilege is broad enough to shield communications made between the attorney and client which the attorney shares with the agent or scientific expert. Coyle v. Estate of Simon, 247 N.J. Super. 277, 281-82, 588 A.2d 1293 (App.Div. 1991). It is on this ground that Dr. Blake and defendant claim that the reports are protected by the attorney-client privilege. Dr. Blake and defendant suggest that the attorneys, in retaining Dr. Blake's services, necessarily must relay attorney-client communications to Blake to enable him to perform his analysis.
To the extent that confidential attorney-client communications are contained in Dr. Blake's reports, those communications would be privileged. See Coyle, supra, 247 N.J. Super. at 281-82, 588 A.2d 1293. It appears that Dr. Blake's reports follow a uniform format. They begin with a restatement of the "background" provided to Dr. Blake by the client's attorney, followed by a description of the physical evidence supplied by the attorney. Dr. Blake then discusses his examination of the physical evidence, describes his genetic analysis and reports his conclusions. Although we have examined only two sample reports, there is a risk that the "background" may contain confidential communications between the attorney and client.[3] Similarly, the physical evidence supplied to Dr. Blake in a particular case may also implicate confidential disclosures by the client.
Our Supreme Court has recognized a relationship between the work product and attorney-client privileges and the Sixth Amendment right to effective assistance of counsel. See State v. Mingo, *320 supra, 77 N.J. at 583-84, 392 A.2d 590. Relying on Mingo, Dr. Blake and defendant contend that disclosure of Dr. Blake's unrelated reports violates the Sixth Amendments rights of Dr. Blake's clients. Of course, this contention applies only to those clients who are defendants or suspects; it does not apply to law enforcement agencies.
In Mingo, defendant was charged with rape and attempted robbery. The victim, prior to being attacked, was given a handwritten note from her assailant. The defendant was subsequently brought into police custody and instructed to provide a handwriting sample containing the exact words written in the rapist's note. Prior to trial, defendant's counsel sought production of the rapist's note in order to have it examined by his own handwriting expert to aid in preparing a defense. Id. at 579, 392 A.2d 590. The court granted defendant's request on the condition that defense counsel would furnish the prosecutor with a copy of any reports rendered by the expert regarding the handwriting, "irrespective of whether the defense intended to use the expert as a witness at trial." Ibid. Defendant's expert concluded that the same person had written each note, and, therefore, the defense attorney determined he would not use this expert at trial. Id. at 580, 392 A.2d 590. The prosecutor obtained a copy of the report pursuant to the discovery order and subsequently subpoenaed the expert to testify on the State's behalf. Ibid.
Although the New Jersey Supreme Court affirmed Mingo's conviction, it ruled that "the report and testimony of a defense-retained expert consultant who will not testify as a defense witness and whose report will not be utilized as evidence are not available to the State." Id. at 587, 392 A.2d 590. The Court relied primarily on the right to effective assistance of counsel guaranteed by the Sixth Amendment and the New Jersey Constitution Art. I, par. 10. The Court explained:
This rule will safeguard the internal strategic processes of the defense. The protection such a rule affords will enhance the ability of the defense attorney to provide effective representation by affording him the maximum freedom to seek the guidance of expert advice in assessing the soundness and advisability of *321 offering a particular defense without the fear that any unfavorable material so obtained can be used against his client.... Reliance upon the confidentiality of an expert's advice itself is a crucial aspect of a defense attorney's ability to consult with and advise his client. If the confidentiality of that advice cannot be anticipated, the attorney might well forego seeking such assistance, to the consequent detriment of his client's cause. The protection from unwarranted disclosure we today mandate is an indispensable element of a criminal defendant's constitutional right to the effective assistance of counsel.
[Ibid.]
In the case at bar, Dr. Blake asserts that many of the case reports at issue contain test results which incriminate defendants in pending cases. If this is correct, the attorney presumably would not utilize that report at trial, and, therefore, in New Jersey, under Mingo, the report would not be subject to disclosure. Id. at 585-86, 392 A.2d 590; State v. Williams, supra, 80 N.J. at 480-81, 404 A.2d 34.
Dr. Blake also asserts that public disclosure of his reports to law enforcement agencies would jeopardize many ongoing homicide investigations across the country. Blake contends that these reports are privileged in their controlling jurisdiction, and then, relying on N.J.R.E. 515, the "official information" privilege, asserts that "simple principles of comity alone would dictate that New Jersey courts ought to protect case reports prepared by Dr. Blake for prosecutors and law enforcement personnel in other jurisdictions."
N.J.R.E. 515 provides:
No person shall disclose official information of this State or of the United States (a) if disclosure is forbidden by or pursuant to any Act of Congress or of this State, or (b) if the judge finds that disclosure of the information in the action will be harmful to the interests of the public.
However, the comment accompanying this rule limits the rule's scope. It states that "[t]his privilege does not apply to the official information of other states, countries or jurisdictions. If such official information is to be privileged from disclosure, the protection would have to rest upon some justification independent of N.J.R.E. 515...." Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 515 (1993-94 ed.).
*322 Application of the work product and attorney-client privileges, as well as Mingo's Sixth Amendment analysis, to the reports at issue is problematic. As previously indicated, it is unlikely that the work product privilege applies. Application of the attorney-client privilege would require examination of each report and probably the development of a record of the context in which each report was produced. Most of the reports were generated outside New Jersey and it would be necessary to determine the law of each relevant jurisdiction regarding the claimed privileges. Moreover, we do not know the extent to which applicable privileges have been waived by Dr. Blake's clients through prior disclosure. In the great majority of cases, Dr. Blake's clients and their lawyers are unaware of this controversy and have not been given the opportunity to be heard.
Although we do not determine the applicability of the privileges or Mingo's Sixth Amendment analysis, their underlying policies inform our view of the issue. Dr. Blake's reports contain private and critical information which should be shielded from undue public exposure. Moreover, litigators, public and private, should have access to the assistance of retained experts with a minimum of risk that their reports, which otherwise have not been placed in the public domain, will surface in unrelated litigation. We are persuaded that these concerns are "relevant considerations" within the meaning of R. 3:13-3(d)(1), which provides:
(d) Protective Orders.
(1) Grounds. Upon motion and for good cause shown the court may at any time order that the discovery or inspection sought pursuant to this rule be denied, restricted, or deferred or make such other order as is appropriate. In determining the motion, the court may consider the following: protection of witnesses and others from physical harm, threats of harm, bribes, economic reprisals and other intimidation; maintenance of such secrecy regarding informants as is required for effective investigation of criminal activity; protection of confidential relationships and privileges recognized by law; any other relevant considerations.
Need is the touchstone of our analysis. Cf. State v. Garcia, 131 N.J. 67, 81, 618 A.2d 326 (1993) (disclosure of police surveillance site requires a substantial showing of need); State v. Cusick, 219 N.J. Super. 452, 459, 530 A.2d 806 (App.Div. 1987) (defendant's *323 need for DYFS' records regarding victim did not outweigh need for confidentiality of records). The State contends that it wants the unrelated reports "to locate additional cases wherein Blake's test results indicated the existence of unexplained contamination in either evidentiary or reference samples." We do not know how many of the subpoenaed reports support an inference of contamination or include an acknowledgement of contamination by Dr. Blake.[4] The record indicates, however, that such reports would tend to be cumulative because Dr. Blake conceded during cross-examination at the first trial that contamination is a risk in DNA analysis.
In preparation for the first trial, the State had access to approximately twenty case reports prepared by Dr. Blake which were in the public domain. The State cross-examined Dr. Blake as to several of them in which contamination had been present. In addition, the State informed us at oral argument that it now has access to an additional twenty case reports other than the reports at issue. Thus, the State has a total of forty reports, and we were further informed that approximately fifteen of them reveal or suggest contamination.
Obviously, the reports at issue will not establish that the DeMarco specimens were contaminated. They may demonstrate that contamination does occur. But Dr. Blake did not testify that contamination does not occur; he denied that the specimens he examined in the DeMarco case were contaminated. We are persuaded, therefore, that the State has not demonstrated a need for the material sufficient to outweigh the legitimate privacy and confidentiality concerns which attach to the subpoenaed material. Consequently, we conclude that the trial court mistakenly exercised its discretion under R. 3:13-3(d)(1) by failing to quash the subpoena.
*324 That part of the order dated September 30, 1993, denying Dr. Blake's application to quash the subpoena is reversed. We affirm that part of the order quashing the subpoena as to "case reports and/or materials in which clients of Barry C. Scheck, Esq. are involved." The matter is remanded for further proceedings.
NOTES
[1] Roche withheld 219 pages of files which had been marked "confidential" on the documents themselves. These "confidential" documents are presently in the custody of the trial judge.
[2] It has also been held that material to which the work product privilege attaches is protected from disclosure in unrelated litigation. See Duplan Corp. v. Moulinage et Retorderie de Chavanoz, 487 F.2d 480 (4th Cir.1973); cf. Hercules Inc. v. Exxon Corp., 434 F. Supp. 136, 153 (D.Del. 1977) (documents prepared for one case have the same protection in a second case where the two cases are closely related in parties or subject matter).
[3] For example, the background section in Dr. Blake's report in this case states that "[t]he following information was communicated to us by Michael J. Rogers, Attorney for John DeMarco." The report then states that DeMarco was "the victim's boyfriend." If the relationship between DeMarco and the victim was a contested issue in this case, which it apparently is not, the concession that DeMarco was the victim's boyfriend, information which the attorney most likely received from his client, could be damning. Although the State's discovery of Dr. Blake's DeMarco report is not at issue, there is a substantial risk that the reports at issue contain, perhaps through inadvertence, confidential or incriminating information.
[4] Apparently, when Dr. Blake finds contamination, or concludes that a specimen is or may be contaminated, he so indicates in his report.