**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1472-23
     A-1473-23
     A-1474-23

STATE OF NEW JERSEY,

  Plaintiff-Appellant,

v.

SUDHAN M. THOMAS,
JOHN CESARO, and
JOHN S. WINDISH,

  Defendants-Respondents.

_____

Argued January 6, 2025 – Decided January 14, 2025

Before Judges Mawla, Natali, and Vinci.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Somerset County, Indictment Nos. 21-01-0003, 21-01-0008, and 21-01-0009.

Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for appellant (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General; Angela Cai, Deputy Solicitor General; Liza B. Fleming, Deputy Attorney General; Jennifer E.

Kmieciak; Steven K. Cuttonaro, Deputy Attorney General, of counsel and on the briefs).

Jeffrey G. Garrigan argued the cause for respondent Sudhan Thomas (Cammarata Nulty & Garrigan, LLC, attorneys; Jeffrey G. Garrigan, on the brief).

Robert E. Dunn argued the cause for respondent John Cesaro (Hanlon Dunn Robertson, attorneys; Robert E. Dunn, on the brief).

Matthew T. Priore argued the cause for respondent John S. Windish (Law Offices of Matthew T. Priore, attorneys; Matthew T. Priore and Scott J. DeRosa, on the brief).

PER CURIAM

In these consolidated appeals involving the State's prosecution of defendants Sudhan M. Thomas, John Cesaro, and John S. Windish, we granted the State leave to appeal from parts of a July 24, 2023 discovery order. We affirm in part, reverse in part, and vacate and remand in part, for the reasons expressed in this opinion.

In late 2017, Matthew O'Donnell, then an attorney-at-law, began cooperating with the State in various public corruption investigations after investigators confronted him with evidence of his own criminal conduct. Through April 2018, the State held several proffer sessions with O'Donnell, during which he offered information about several people, including Windish

2

A-1472-23

and Cesaro. O'Donnell did not mention Thomas, but generally discussed politicians in Hudson County and Jersey City. He claimed he had obtained contracts in Jersey City using straw contributions.

In June 2018, O'Donnell entered an agreement to plead guilty to one count of second-degree conspiracy to commit misconduct by a corporate official, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:21-9(c). In exchange, the State agreed to "not prosecute [O'Donnell] for any other heretofore disclosed activities in connection with any and all unlawful political contributions made by [O'Donnell] or his coconspirators on behalf of [O'Donnell]." O'Donnell agreed to pay restitution, and the State agreed to recommend an eight-year prison sentence.

On February 27, 2019, the New Jersey Office of the Attorney General, Division of Criminal Justice (DCJ) Deputy Bureau Chief Jeffrey Manis, authorized a consensual intercept of O'Donnell's communications for a period of thirty days. The targets included one named individual, whose name was redacted "as yet unidentified individuals."

On the same date, a recording was made of O'Donnell's communications at a political fundraiser at a Bayonne restaurant. Among the conversations intercepted was one O'Donnell had with Thomas, in which Thomas expressed his gratitude to O'Donnell "because you're one of the first guys that came out."

A-1472-23

O'Donnell responded: "Remember, I'm always here for you" and offered to help Thomas "build a war chest" for the November election. Both men subsequently messaged each other and agreed to meet on May 1, 2019.

In discovery, the State provided Thomas with documents pertaining to the February 2019 conversation. The discovery transmittal letter noted the documents were redacted to the extent they contained information "related to a confidential investigation that did not result in any criminal charges against any third-parties."

Deputy Chief Manis signed additional authorizations for consensual intercepts on April 30 and May 29, 2019. Acting counsel, Anthony Picione, AAG, also signed authorizations on June 28, July 27, and August 26, 2019. On each of these forms, the targets are identified as Thomas "and as yet unidentified individuals."

On July 29, 2019, after Thomas was recorded meeting with O'Donnell and receiving cash from him, investigators stopped Thomas, who then gave them a statement. Thomas told police he "reached out" to O'Donnell and asked for "some financial help" because he was "having some personal difficulty," and O'Donnell "said he'd help [Thomas] out." Thomas was introduced to O'Donnell in 2016, during a time when he was looking for a lawyer for his campaign.

4

However, he had not seen O'Donnell for years, until meeting him at an event in February or March of 2019.  Thomas contacted O'Donnell because he had known him "for many years."  Although they "don't have any business relationships," they had a "long relationship," and Thomas "trusted" and "look[ed] up to [him] because of the counsel that he ha[d] given" Thomas.

Thomas admitted to taking cash from O'Donnell, which he claimed was a loan.  Although he was a "little hesitant" about taking the cash, he trusted O'Donnell's judgment because O'Donnell was a lawyer and "a respectable man." Thomas "didn't think that [O'Donnell] was doing anything illegal" because he thought "the guy knows probably what he's doing."

Thomas admitted O'Donnell asked him for a position as counsel to the Jersey City Board of Education (JCBOE), but Thomas responded, "that's not possible."  He claimed this occurred during "stand alone conversations" unrelated to money, and O'Donnell's request was not a quid pro quo.  Before there was ever any transaction, Thomas sought O'Donnell's help on JCBOE's real estate projects.  O'Donnell declined Thomas's request to serve as an appraiser but accepted his request for legal services regarding a request for proposals involving the JCBOE.  Thomas claimed he would never have contacted O'Donnell if he knew he "was caught up with other things."

5

In January 2021, the State presented its cases against Thomas, Cesaro, and Windish to a state grand jury. A DCJ detective from the Office of Public Integrity and Accountability testified for the State.

The detective explained the State had conducted a criminal investigation into O'Donnell and his law firm. In late 2017, investigators confronted O'Donnell with the evidence against him and he agreed to become a cooperating witness, including wearing a recording device while interacting with individuals who had sought financial assistance from him in the past.

O'Donnell advised investigators that one such individual was Windish, who was first elected to the Mount Arlington Borough Council in 2010, the same year O'Donnell was retained as the borough's attorney. O'Donnell's contract with the borough was renewed on an annual basis.

In 2018, Windish was running for reelection. O'Donnell told investigators that Windish had approached him for a $7,000 donation for his campaign. On May 1, 2018, O'Donnell recorded a conversation in which Windish said he needed "seven." On May 4, 2018, in a recorded communication, Windish repeated he needed $7,000. When Windish mentioned that he did not know how he would ever repay O'Donnell, O'Donnell responded by asking Windish to promise that O'Donnell would "always be [Windish's b]orough [a]ttorney."

6

O'Donnell said this was the "only quid pro quo" and Windish responded: "You'll always be most definitely, leave no doubt in your mind." Windish also said O'Donnell would always have his support. In a May 10, 2018, recorded conversation, Windish again confirmed his request for $7,000.

Windish and O'Donnell met in person on May 14, 2018. The meeting was recorded. O'Donnell gave Windish an envelope with $7,000 in cash. O'Donnell again asked Windish to commit to backing him as borough attorney, and Windish responded: "You got it."

O'Donnell reported to investigators that at a political fundraiser in January 2018, Cesaro, a Morris County Commissioner, asked for his financial assistance. In exchange, Cesaro offered to secure more work for O'Donnell in Morris County. The State began to record conversations between both men.

In a recorded conversation on April 20, 2018, Cesaro agreed to support O'Donnell as tax counsel in exchange for money. In a recorded conversation on May 1, 2018, Cesaro repeated his support. O'Donnell said he wanted to be tax counsel for Parsippany Township, and Cesaro promised to support him for the position in exchange for O'Donnell providing Cesaro with financial assistance for his reelection campaign.

A-1472-23

On May 7, 2018, during a recorded conversation, Cesaro and O'Donnell agreed to meet the following day. The pair met on May 8, 2018, and O'Donnell was recorded giving Cesaro an envelope with $10,000 in cash and five checks totaling $2,350 in campaign contributions. O'Donnell reiterated he wanted tax work, and asked Cesaro to "open doors" for him and speak with county counsel about the issue. Cesaro agreed.

The following day, in a recorded communication, Cesaro expressed that he wanted to return the cash to O'Donnell because he preferred the money to come through straw donors. Both men met on May 11, 2018, and Cesaro returned the cash to O'Donnell. Then they discussed the use of straw donors. O'Donnell said he would try to get additional straw donor checks to Cesaro by May 21, 2018.

On May 19, 2018, O'Donnell attended a fundraiser for Cesaro. He was recorded providing Cesaro with: $4,800 in cash; two checks of $2,600 each drawn on undercover accounts funded by the State; a third check for $150 from O'Donnell's firm; and New Jersey Law Enforcement Election Commission (ELEC) forms filled out for each check. O'Donnell told Cesaro the checks for $2,600 were from straw donors. When Cesaro later filed the ELEC reports, he reported both straw donor checks received from O'Donnell.

The detective's grand jury testimony concluded with the evidence against Thomas. O'Donnell told investigators he first met Thomas in 2016, when Thomas was running for a JCBOE seat. At that time, Thomas asked O'Donnell for a $10,000 cash donation, but O'Donnell never gave him the money.

On February 27, 2019, O'Donnell spoke with Thomas at a political event. During the recorded conversation, they briefly discussed Thomas's upcoming campaign for reelection to the JCBOE, and O'Donnell asked Thomas to call him.

Over the next few months, O'Donnell and Thomas exchanged several telephone calls, and on May 1, 2019, they met at a diner. Thomas was recorded telling O'Donnell that he wanted to raise "about 100" for the JCBOE election, and "150" for an anticipated run for Jersey City Council. O'Donnell informed Thomas he had "a tremendous amount of . . . financial resources," and asked Thomas "how much do you really think . . . what do you expect from me? What do you want?" Thomas responded he wanted O'Donnell's help in raising "somewhere between [thirty-five] and [forty-five]" for the JCBOE election but would need "a larger lift from [O'Donnell for the council race.] Maybe [seventy-five] or so, that is what I am looking for. I have a good network . . . but if you can help me raise [thirty] to [forty percent], that will take a lot of pressure off of me."

Both men met again on June 3, 2019. During this recorded conversation, O'Donnell referred to their prior conversation, in which Thomas had asked him "to raise [thirty-five]." O'Donnell responded he could get that sum within a week. Thomas said "Okay[,]" and O'Donnell then said: "So when the time comes . . . this is all I'm asking. I just want you to consider me as [s]pecial [c]ounsel to the [b]oard. That's all I'm asking." Thomas responded "Done[,]" and added: "I will tell you how I will bring you on. I bring you on as [s]pecial [c]ounsel for [the] [r]eal [e]state [a]dvisor." When O'Donnell complimented Thomas on the idea, Thomas responded: "Yeah, nobody questions anything . . . nobody questions all that stuff."

On June 7, 2019, O'Donnell had a recorded telephone call with Thomas. They discussed a meeting with the JCBOE business administrator because Thomas wanted O'Donnell to start on appraisal work for several JCBOE properties.

The pair met again on June 17, 2019. During the recorded meeting, they discussed the BOE having hired O'Donnell to provide appraisal services for several buildings. O'Donnell then handed Thomas an envelope containing $10,000. O'Donnell remarked "I thank you for coming through. I have never got a job this quickly." Later the same evening, O'Donnell had a recorded phone

conversation with Thomas, in which Thomas confirmed the business administrator would contact O'Donnell regarding the property appraisals.

On July 11, 2019, O'Donnell had a recorded phone conversation with Thomas, during which the two agreed to meet in person on July 29. Thomas asked O'Donnell to bring the balance of the amount originally requested. The pair met on July 29, and O'Donnell was recorded giving Thomas an envelope containing $25,000 in cash. As Thomas took the envelope, he said: "Thanks Matt, I appreciate it." Investigators subsequently stopped Thomas.

Windish was indicted on: second-degree official misconduct, N.J.S.A. 2C:30-2; second-degree bribery in official and political matters, N.J.S.A. 2C:27-2; and second-degree acceptance or receipt of an unlawful benefit by a public servant for official behavior, N.J.S.A. 2C:27-10(a). Cesaro was separately indicted on: second-degree official misconduct, N.J.S.A. 2C:30-2; second-degree bribery in official and political matters, N.J.S.A. 2C:27-2; second-degree acceptance or receipt of an unlawful benefit by a public servant for official behavior, N.J.S.A. 2C:27-10(a); third-degree tampering with public records or information, N.J.S.A. 2C:28-7(a)(2); fourth-degree falsifying or tampering with records, N.J.S.A. 2C:21-4(a); and fourth-degree concealment or misrepresentation of contributions or expenditures, N.J.S.A. 19:44A-21(b).

11

Thomas was separately indicted on: second-degree official misconduct, N.J.S.A. 2C:30-2; second-degree pattern of official misconduct, N.J.S.A. 2C:30-7(a); second-degree bribery in official and political matters, N.J.S.A. 2C:27-2; and third-degree acceptance or receipt of an unlawful benefit by a public servant for official behavior, N.J.S.A. 2C:27-10(a).

In October 2021, O'Donnell entered a second plea agreement, which contained a broader agreement not to prosecute. This agreement also required he pay restitution.

Following the indictments, there were several discovery disputes. Thomas's counsel demanded: "[a]ll discovery relating to investigations initiated by the State involving . . . O'Donnell as a cooperating witness for the State regardless if they resulted in criminal charges or not;" "[t]o the extent not all crimes of . . . O'Donnell or O'Donnell McCord[1] are reflected in documents possessed by the State, provide a list of all crime(s) believed to have been committed by . . . O'Donnell or O'Donnell McCord[,] which the State has agreed to not prosecute;" and "all information presented to . . . [Deputy Chief] Manis, which led to the signing of the consensual intercept forms dated April 30th, May 29th, June 28th, July 27th and August 26[], 2019."

---

[1] This is the name of O'Donnell's former law firm.

In response, the State cited State v. Hernandez, 225 N.J. 451 (2016) in support of its position that Thomas did not have the right to discovery of files in unrelated cases involving the same cooperating witness. It asserted there were "no nonprivileged documents" responsive to Thomas's "request for 'a list of all crime(s) believed to have been committed by . . . O'Donnell or O'Donnell McCord in which the State has agreed to not prosecute.'" The State's privilege log showed only one document withheld on the grounds of privilege. It represented it had produced all non-privileged documents responsive to Thomas's request for the information presented to Deputy Chief Manis, leading to his authorization of the consensual intercepts.

In June 2023, Thomas made an omnibus discovery motion. He argued he had an attorney-client relationship with O'Donnell in 2016, which the State had exploited in its investigation. Thomas claimed the State prosecuted him in retaliation for a litigation the JCBOE filed against the State on April 29, 2019.

In relevant part, Thomas sought an order compelling the State to provide:

> 1. . . . any and all documentation and information that were reviewed by Deputy Chief . . . Manis and formed the basis for the issuance of the [c]onsensual [i]ntercept [f]orms dated February 27, 2019, April 30, 2019, May 29, 2019, June 28, 2019, July 27, 2019 and August 26, 2019;
>
> . . . .

3. . . . any and all documents relating to their criminal investigations involving . . . O'Donnell, whether or not resulting in criminal charges, which are to be produced pursuant to a [p]rotective [o]rder or in camera review by the [c]ourt; [and]

4. . . . a list of all the crimes committed by . . . O'Donnell, the identification of the victims related thereto, and the amounts of restitution as identified in the plea agreements . . . .

Along with Thomas's motion, the motion judge also heard the State's motion to quash a subpoena that had been served on O'Donnell's law firm.

On July 24, 2023, the judge issued an order, which denied the State's motion to quash the subpoena, and granted in part and denied in part Thomas's motion. The judge ordered the State to provide:

a) . . . any and all documentation and information that were reviewed by Deputy Chief . . . Manis[,] which formed the basis for the issuance of the [c]onsensual [i]ntercept [f]orms dated February 27, 2019, April 30, 2019, May 29, 2019, June 28, 2019, July 27, 2019 and August 26, 2019;

b) . . . any and all documents relating to their criminal investigations involving . . . O'Donnell, whether or not resulting in criminal charges, pursuant to a [p]rotective [o]rder; [and]

c) . . . a list of all the crimes committed by . . . O'Donnell, the identification of the victims related thereto, and the amounts of restitution . . . .

14

In August 2023, Cesaro and Windish joined in the request for all documentation reviewed by Deputy Chief Manis.

The State moved for reconsideration. It noted the information it obtained from the August 23 and 24, 2023 interviews of O'Donnell, in which O'Donnell stated he never had an attorney-client relationship with Thomas or Cesaro, or their campaigns, but his firm had represented Windish personally in three separate matters. The motion judge denied the motion on October 2, 2023.

The State moved for leave to appeal and asked the motion judge to stay parts (b) and (c) of the July 2023 order. On November 8, 2023, the motion judge ruled the July 24, 2023 order applied to all three defendants. He stayed parts (b) and (c) pending appeal but ordered that pending appeal the parties must comply with part (a).

On January 9, 2024, the State wrote to the motion judge and advised there were no additional responsive documents with respect to part (a) of the July 2023 order. The State identified the documents already produced, which contained "[t]he foundational knowledge that Deputy Chief . . . Manis had when he issued the consensual intercept forms." "Deputy Chief Manis also relied upon information he received through verbal updates and conversations[,]" but "[a]ny factual information learned by Deputy Chief Manis through those verbal updates

15

and conversations is reflected in the investigation reports . . . , which have already [been] produced to the defense."

The State raises the following points on appeal:

POINT I

ORDERING THE STATE TO PRODUCE AN INTERNAL PROSECUTION MEMORANDUM VIOLATES BOTH WORK PRODUCT AND DELIBERATIVE-PROCESS PRIVILEGES.

POINT II

ORDERING PRODUCTION OF CASE FILES OF UNRELATED INVESTIGATIONS FOR IN CAMERA REVIEW CONFLICTS WITH NEW JERSEY SUPREME COURT PRECEDENT.

POINT III

DEFENDANTS HAVE NO BASIS TO OBTAIN FURTHER DISCOVERY REGARDING THE CONSENSUAL INTERCEPTS.

I.

We "generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." State v. Ramirez, 252 N.J. 277, 298 (2022) (quoting State v. Brown, 236 N.J. 497, 521 (2019)). "A trial court can abuse its discretion 'by failing to consider all relevant factors.' [We] . . .

16

will set aside or modify such decisions if they do not comport with the applicable law or do not give sufficient regard to pertinent considerations." Ibid. (internal citation omitted).

"As codified in Rule 3:13-3, New Jersey has a tradition of what is often described as an 'open file' model of reciprocal pretrial criminal discovery. . . . Thus, criminal defendants are 'entitled to broad discovery' because it 'advances the quest for truth.'" Id. at 295 (quoting State v. Scoles, 214 N.J. 236, 252 (2013)).

> Nevertheless, despite a criminal defendant's general and automatic right to "broad discovery," . . . "criminal discovery has its limits."  . . . Defendants are not permitted to conduct a "fishing expedition," or "transform the discovery process into an unfocused, haphazard search for evidence."  Hence, information must be shown to be relevant to the issues in the case in order to be subject to disclosure.
>
> [Id. at 296 (internal citations omitted).]

Relevant information has "'a tendency in reason to prove or disprove [a] fact of consequence to the determination of the action[,]'" State v. Gilchrist, 381 N.J. Super. 138, 146 (App. Div. 2005) (quoting N.J.R.E. 401), or lead to the discovery of relevant evidence.  See State v. Ballard, 331 N.J. Super. 529, 538 (App. Div. 2000).

17

The State is duty bound to disclose evidence potentially favorable to the defense. Brady v. Maryland, 373 U.S. 83, 87 (1963). The evidence need not be directly exculpatory if it has value for impeachment purposes. State v. Nash, 212 N.J. 518, 544 (2013). "The Brady disclosure rule applies only to information of which the prosecution is actually or constructively aware." State v. Nelson, 155 N.J. 487, 498 (1998).

## II.

## A.

In point I, the State contends part (c) of the July 2023 order requiring it to produce a March 16, 2018 internal prosecution memorandum was erroneous, because this information is protected from disclosure by the work product and deliberative process privileges. This part of the order also required the State to "provide a list of all the crimes committed by . . . O'Donnell, the identification of the victims related thereto, and the amounts of restitution."

The State's privilege log asserted the work product and deliberative process privileges applied to an internal prosecution memorandum, which was written by three deputy attorneys general to AAG Picione, entitled: "Memorandum regarding proposed plea agreement – State v. MOD; State v. O'Don[n]ell McCord, P.C." As we noted, Thomas then filed a motion to compel.

He not only sought the March 2018 internal memorandum, but also asked the court to order the State to create a document including the requested information.

The State responded that the benefit of O'Donnell's bargain was set forth in the plea agreement, which had been produced in discovery. It neither possessed a document setting forth a list of crimes O'Donnell committed, nor any document identifying the restitution to be paid by O'Donnell. At most, there was the privileged, internal prosecution memorandum that addressed the investigations in which O'Donnell was cooperating.

In granting the defense's request, the motion judge noted he understood that a list of crimes did not exist, but ruled the information was relevant "on possible bias that O'Donnell may have for assisting the State with their investigations. For the defense, it is a 'list' of determining O'Donnell['s] credibility as a cooperating witness for the State. N.J.R.E. 608." Pursuant to N.J.R.E. 608(b), the judge reasoned O'Donnell's "character for truthfulness may be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged." Moreover, "the identification of O'Donnell's 'other' crimes is relevant evidence,

pursuant to [N.J.R.E.] 401-402, because the evidence has a potentially reasonable tendency to prove or disprove any facts of consequence."

The judge concluded the discovery was needed "to best determine O'Donnell's position as a cooperating witness, in this case, because there were other entities targeted by prior State investigations that heavily involved O'Donnell's cooperation." He ordered "the State is to provide . . . defense counsel with the discovery materials identifying the crimes, victims, and restitution that allowed the State to determine an appropriate plea bargain with O'Donnell to initiate the subsequent investigations, including that of . . . Thomas."

The judge did not address the State's claims of privilege regarding the March 2018 internal memorandum. The State's motion for reconsideration reiterated the arguments based on privilege and requested the judge analyze those claims as they related to the March memorandum.

The motion judge denied the reconsideration motion. His findings did not squarely address the State's claims of privilege, except in the following excerpt: "Any clarification I had . . . was . . . don't provide . . . any work product, internal reports . . . or memorandum that's subject to Rule [3:13-3(e),] that's not

referenced elsewhere in this decision, so don't invent new things to produce but anything they asked for they get."

The State's discovery obligations under Rule 3:13-3(b), include that it "must disclose any promise of favorable treatment or leniency offered to a witness, including any plea or cooperation agreement setting forth the benefits to the witness." Hernandez, 225 N.J. at 463. A cooperating witness's plea agreement is discoverable because it is relevant to a defendant's right to confront the witnesses against them and examine their biases, prejudices, or ulterior motives to discredit the witnesses or affect the weight afforded to their testimony. Id. at 464-65.

Pursuant to Rule 3:13-3(d), "work product" documents are not subject to disclosure. The Rule "does not require discovery of a party's work product consisting of internal reports, memoranda or documents made by that party or the party's attorney or agents, in connection with the investigation[ or] prosecution . . . of the matter." Ibid.

The work product privilege is designed to protect from pretrial disclosure an attorney's mental processes and litigation strategies. State v. Mingo, 77 N.J. 576, 584 (1978) (citing State v. Montague, 55 N.J. 387, 401 (1970)). It "prohibits disclosure of certain materials prepared by an attorney in anticipation

of litigation, and thereby 'creates a zone of privacy in which an attorney can investigate, prepare, and analyze a case.'"  State v. DeMarco, 275 N.J. Super. 311, 316 (App. Div. 1994) (quoting In re Grand Jury Subpoena Dated Nov. 8, 1979, 622 F.2d 933, 935 (6th Cir. 1980)).

The work product privilege "is not absolute."  United States v. Nobles, 422 U.S. 225, 239 (1975).  It may be overcome through a strong showing of need that the information sought is both relevant and necessary to a fair determination of the issues.  State v. Mitchell, 164 N.J. Super. 198, 202 (App. Div. 1978).

"The deliberative process privilege is a doctrine that permits the government to withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated."  In re Liquidation of Integrity Ins. Co., 165 N.J. 75, 83 (2000).  The privilege "is rooted in the notion that the sovereign has an interest in protecting the integrity of its deliberations." Ibid.

The document the State seeks to protect must be:  (1) "generated before the adoption of an agency's policy or decision"; and (2) "deliberative in nature, containing opinions, recommendations, or advice about agency policies."  Id. at

84-85. "Purely factual material that does not reflect deliberative processes is not protected." Id. at 85. However, "a record, which contains or involves factual components, is entitled to deliberative-process protection when it was used in the decision-making process and its disclosure would reveal deliberations that occurred during that process." Educ. L. Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 280, 299-300 (2009).

"[A] litigant may obtain deliberative process materials if [their] need for the materials and the need for accurate fact-finding override the government's significant interest in non-disclosure." In re Liquidation of Integrity Ins. Co., 165 N.J. at 85. "As with any privilege, the party seeking such documents bears the burden of showing a substantial or compelling need for them." Ibid. To determine whether the privilege has been overcome the court considers "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." Id. at 85-86. The deliberative process privilege is generally overcome only in "exceptional cases." Id. at 85.

The March 2018 memorandum is not in the appellate record. Regardless, the record lacks an analysis of the State's privilege claims pursuant to the legal

A-1472-23

principles we have outlined above. For these reasons, we vacate and remand this aspect of the order and direct the motion judge to conduct an in camera review of the document and make findings regarding whether it is protected by the privilege(s) asserted by the State.

## B.

A court may order discovery beyond what is required in the Rules of Court, but only if it will "further the truth-seeking function or ensure the fairness of a trial." Hernandez, 225 N.J. at 463 (quoting State in the Int. of A.B., 219 N.J. 542, 560 (2014)). The court should consider whether the evidence would contribute to an adequate defense, and whether the evidence could be obtained from another source. A.B., 219 N.J. at 555. "When a defendant seeks discovery outside of the categories permitted by our court rules, [they] bear[] the burden of establishing need." Ibid. (citation omitted).

That said, the Rules of Court require only the production of documents already in existence that are within the State's possession. State v. Chambers, 252 N.J. 561, 582-83 (2023); see also State v. Tier, 228 N.J. 555, 565 (2017) (holding a trial court abused its discretion requiring defendant to generate a witness statement where none exists, contrary to Rule 3:13-3).

The State had no legal obligation to create a document for the defense to use in cross-examining O'Donnell. It produced O'Donnell's plea agreement. And as regards O'Donnell's credibility or potential for bias, it is O'Donnell's understanding of his sentencing exposure, and the value of his plea agreement, that is probative on these issues. Davis v. Alaska, 415 U.S. 308, 317-18 (1974); State v. Jackson, 243 N.J. 52, 73 (2020) (citing United States v. Ambers, 85 F.3d 173, 176 (4th Cir. 1996)). For these reasons, we reverse the portion of the motion judge's order requiring the State to create "a list of all the crimes committed by . . . O'Donnell, the identification of the victims related thereto, and the amounts of restitution" O'Donnell must pay.

III.

In point II, the State seeks reversal of part (b) of the July 2023 order. It argues this portion of the order, which compelled it to "provide any and all documents relating to [its] criminal investigations involving . . . O'Donnell, whether or not resulting in criminal charges, pursuant to a [p]rotective [o]rder" was erroneous as a matter of law.

The judge found this discovery relevant

> because there is a possibility that the documents could support (1) Thomas's claim that the State somehow exploited a purported attorney/client relationship between O'Donnell and Thomas; (2) Thomas's claim of

entitlement to statements made by O'Donnell pursuant [to] N.J.R.E. 608; and, (3) to determine if O'Donnell discussed other crimes he committed not referenced in his statements contained in the discovery.

Investigations involving O'Donnell are relevant in this case because of the role he played as a main and cooperating witness.

Pursuant to Rule 3:13-3(f), the judge concluded this information was "crucial to this case and to the defense's argument." He ordered it turned over "for in camera review or subject to a protective order." Pursuant to Rule 3:13-3(e), the judge noted his order excluded "[a]ny party's work product[;] internal reports[; and m]emoranda."

In Hernandez, the defendants claimed the discovery rules granted them the right to: "sift through the files in the unrelated investigations . . . in search of false and contradictory statements"; impeach a cooperating witness under N.J.R.E. 608; refresh the witness's recollection under N.J.R.E. 612; and "uncover false criminal accusations against others that would be admissible under N.J.R.E. 608." 225 N.J. at 465-67. Our Supreme Court held the defendants were not entitled to discovery from unrelated cases merely because their case had the same cooperating witness as the unrelated cases. Id. at 464. The defendants also had no right to discovery of all statements made in every

case in which the witness has cooperated with the State. Id. at 453-54. The Court explained:

> Although our discovery rule generally requires that the State provide all evidence relevant to the defense of criminal charges, it does not open the door to foraging through files of other cases in search of relevant evidence. The only information discoverable in the unrelated cases that is relevant to the defense at this point are the cooperation agreements between the State and the [w]itness and any violations of the agreements, such as material false statements made by the [w]itness and known to the State.
>
> [Ibid.]

Defendants must rely upon the State to comply with its obligation to turn over exculpatory information. Id. at 465-67. "An open-ended search of unrelated investigative files in the hope that something may turn up that has impeachment value is not sanctioned by our discovery rule or jurisprudence." Id. at 467.

The Court added:

> We fully understand that the reliability of State informants and cooperating witnesses must be subject to special scrutiny because the charge-reduction and sentence-reduction incentives given to such witnesses have the capacity to induce false testimony. That is why the State is required to make complete disclosure of the cooperation and plea agreements. Through defendants' cross-examination and summation, the jury will know that the [w]itness has a powerful reason to curry favor with the State. In addition, the State is required as part of its discovery obligation to disclose

27

known material false statements made by the [w]itness in the unrelated investigations because such disclosures bear on whether the State is enforcing or altering its cooperation agreement. We have no reason to believe that the State will not fulfill its professional responsibilities in making any required disclosures.

[Id. at 468.]

We conclude part (b) of the order entered here was contrary to Hernandez. Like the defendants in Hernandez, here defendants argued for discovery of the other unrelated case files on grounds of their potential to contain information to impeach O'Donnell. Given the State's obligation to turn over exculpatory information, including material evidence that could be used to impeach the State's witnesses–namely prior false accusations subject to N.J.R.E. 608(b)–or evidence of other crimes committed by O'Donnell, defendants were not entitled to independently search through the State's files from unrelated criminal investigations to uncover that information for themselves. Indeed, "[t]he ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." Pennsylvania v. Ritchie, 480 U.S. 39, 53 (1987).

The attorney-client relationship also was not grounds to grant this discovery. Aside from whether O'Donnell and Thomas ever had an attorney-

28

client relationship, even with the admitted attorney-client relationship between O'Donnell and Windish, it is the defendants who are in the best position to provide evidence that O'Donnell exploited their attorney-client relationships through his cooperation.

IV.

In point III, the State asserts that it complied with part (a) of the July 2023 order requiring it to produce "any and all documentation and information that were reviewed by Deputy Chief . . . Manis[,] which formed the basis for the issuance of the [c]onsensual [i]ntercept [f]orms." Nevertheless, the State asks us to vacate this part of the order, because defendants have no credible challenge to the consensual intercepts or a basis to obtain further discovery regarding them. Defendants are not "entitled to an accounting" of the documents and information considered by Deputy Chief Manis, as it has no relevance to the validity of the intercepts. According to the State, the record demonstrates the consensual intercepts were authorized because they would likely lead to relevant evidence of corrupt conduct by defendants.

The motion judge reasoned the information regarding the consensual intercepts was relevant pursuant to Rule 3:13-3(b)(1)(J) because "all documents and materials mentioning . . . Thomas prior to May 1, 2019, . . . may shed light

29

on whether Thomas was unfairly targeted for investigation solely due to the [JCBOE]'s lawsuit against the State." The judge noted that "[p]rior to April 29, 2019, there was no evidence or discovery on Thomas's participation in any criminal conduct before his arrest on July 29, 2019. . . . [D]efense counsel seeks information . . . as to why Thomas was investigated to begin with, thus signifying its relevance." The judge also found this information would help accelerate the case and even though "the State argued that a low standard of reasonableness is needed to sign the consensual intercept form, any and all information on what led to the State's reasonableness standard to be satisfied should be provided to the defense."

On the motion for reconsideration, the State indicated it had complied with part (a) of the July 2023 order because it produced all documentation reflecting the information developed in the investigation and supporting Deputy Chief Manis's approval of the consensual intercepts. The judge reasoned that even though the State claimed it had already turned over the documents, "the order is going to remain in place . . . . And if defense counsel is not satisfied that they've been sufficiently pointed in the right direction, they can . . . try to work that out with counsel, . . . and if not, bring it to the attention of this [c]ourt."

30

On January 9, 2024, the State advised the defense it reviewed the discovery it previously provided responsive to part (a) and "identified no additional responsive documents."  It then identified the documents it already produced, which contained "[t]he foundational knowledge that Deputy Chief . . . Manis had when he issued the consensual intercept forms . . . .  Deputy Chief Manis also relied upon information he received through verbal updates and conversations."  The State represented that the investigation reports already produced to the defense contained "[a]ny factual information [he] learned . . . through those verbal updates and conversations is reflected in the investigation reports."

The New Jersey Wiretapping and Electronic Surveillance Control Act, states:

> It shall not be unlawful under this act for:
>
>     . . . .
>
> c. Any person acting at the direction of an investigative or law enforcement officer to intercept a wire, electronic or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception; provided, however, that no such interception shall be made without the prior approval of the Attorney General or [their] designee or a county prosecutor or [their] designee;

[N.J.S.A. 2A:156A-4(c).]

N.J.S.A. 2A:156A-21 lays out the conditions on which any aggrieved person in a matter may move to suppress the contents of an intercepted communication.

Discovery regarding consensual intercepts is permitted where the intercepts are expected to yield relevant information. State v. Martinez, 461 N.J. Super. 249, 275 (App. Div. 2019). However, courts may also consider whether the intercepts were premised upon an impermissible motive, including animus against the defendant, and whether the intercepts violated a defendant's constitutional right, or the attorney-client privilege. Id. at 275-76.

Pursuant to these principles, we discern no error in part (a) of the court's order. The documentation supporting the authorization of the consensual intercepts was relevant to the State's ability to admit the intercepted communications into evidence and defendants' challenges to the lawfulness of the intercepts.

We decline to wade into the arguments regarding the admissibility of the intercepts and their lawfulness because the issue is not ripe for review as the trial court had not yet held a hearing to resolve it. As the motion judge mentioned, the trial court may address any complaints regarding the

completeness of discovery relating to the authorizations of consensual intercepts as to the defendants.

For these reasons, part (a) of the July 24, 2023 order is affirmed; part (b) is reversed; and part (c) is reversed in part, and vacated and remanded in part, for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

33